COMMONWEALTH of Pennsylvania, Appellee,

v.

Teri Lynn LEVANDUSKI, Appellant.

Superior Court of Pennsylvania.

Argued Nov. 15, 2005.

Filed Aug. 2, 2006.

**4**

Mark S. Love, Tannersville, for appellant.

Mike Mancuso, Asst. Dist. Atty., Strousburg, for Com., appellee.

BEFORE: DEL SOLE, P.J., JOYCE, MUSMANNO, LALLY-GREEN, TODD, KLEIN, BENDER, BOWES, and GANTMAN, JJ.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, Teri Lynn Levanduski, appeals from the judgment of sentence entered in the Monroe County Court of Common Pleas, following her jury-trial conviction for murder in the first degree as an accomplice,[1] conspiracy to commit murder in the first degree,[2] hindering apprehension,[3] and solicitation to commit murder in the first degree.[4] Appellant asks us to determine whether: (1) the trial court committed reversible error when it admitted a letter, written by the victim, identifying Appellant as a suspect and suggesting her motive for his murder; (2) the suppression court erred when it refused to suppress Appellant's inculpatory statements, which were obtained during a custodial interrogation, absent *Miranda*[5] warnings; (3) the trial court erred when it admitted into evidence at trial the nude and semi-nude photographs of Appellant and her paramour, Mr. Lennard Fransen. We hold: (1) the trial court erred when it admitted the victim's letter at trial, because the letter constitutes hearsay and does not qualify for admission at trial under a recognized exception to the hearsay rule; nevertheless, this evidentiary ruling was harmless error, where otherwise properly admitted evidence overwhelmingly es-

---

1. 18 Pa.C.S.A. § 2501(a); 18 Pa.C.S.A. § 306.

2. 18 Pa.C.S.A. § 2501(a); 18 Pa.C.S.A. § 903.

3. 18 Pa.C.S.A. § 5105.

4. 18 Pa.C.S.A. § 2501(a); 18 Pa.C.S.A. § 902.

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tablished Appellant's guilt beyond a reasonable doubt; (2) Appellant's confession was admissible because she was not the subject of a custodial interrogation when she initially confessed; and, after receiving her *Miranda* warnings and waiving her right to remain silent and right to counsel, she freely and willingly repeated her confession to police; (3) Appellant's third issue is waived for failure to develop a cognizable or appropriate legal argument on appeal. Accordingly, we affirm.

¶ 2 The relevant facts of this case are as follows. Appellant's parents lived next door to Appellant and her common-law husband, Mr. Robert Sandt, the victim. On November 27, 2002, at approximately 10:10 P.M., Appellant's father was standing in his driveway outside his home. He heard sounds resembling gunshots coming from the home of Appellant and Mr. Sandt. Appellant's father saw exhaust rising from a car idling in Appellant's driveway. Shortly thereafter, Appellant's father saw a dirty white car with two occupants leaving Appellant's home.

¶ 3 Appellant's mother went to Appellant's home to check on Mr. Sandt. She entered the home through the back door and saw Mr. Sandt collapsed face down in a chair. There was blood on his face. Appellant's mother called 911, who asked her to take a pulse. Mr. Sandt had no pulse.[6]

¶ 4 Appellant's mother called Appellant at work to report Mr. Sandt's death. Appellant left work to return home. When she reached her home, the police were already present and conducting an investigation. The police asked Appellant to wait at her parents' house next door.

¶ 5 Meanwhile, the police officers had noticed a clump of hair and some blood on the front porch of Appellant's home. A planter and some furniture had been knocked over, indicating a struggle had taken place. After obtaining search warrants, police officers examined the home including the contents of a trashcan located in the kitchen. In the trashcan, they found a ripped-up letter. Investigation revealed that Mr. Sandt had written the letter, but the police were unable to determine when Mr. Sandt had written the letter. In the letter, Mr. Sandt wrote of his suspicions about Appellant and Mr. Fransen and their plan to do away with Mr. Sandt. The letter hypothesized that Appellant and Mr. Fransen were going to kill Mr. Sandt with his own missing .22 caliber revolver. Mr. Sandt's letter read as follows:

> To whom it may concern
> On around November 1st I found a note to [Appellant] from a truck driver from Newark NJ named Bob Beaton on the note he said he wanted to get together with her. So I [asked] her about it. She said that she gets notes all the time from the [horny] truck drivers. So I started to look around [Appellant's] things and found two more notes. So I looked in her pocket book and I found a letter. The letter was to a guy named Lenny a truck driver I think he lives in [Hackettsown], NJ. And works for Inter [County Paving] of [Hackettsown]. It described how [Appellant loved] this man[,] how he made her [feel,] and things they did. It [broke] my heart to read. So I looked even harder [and] I found [another] letter. It said that she wanted to leave me and said she wanted me gone so [she] and Lenny could be

6. A subsequent medical examination revealed defensive wounds on Mr. Sandt's legs and arms; Mr. Sandt suffered five .22 caliber gun shots to the head, plus one in the back and one in the chest.

together and he should have everything I have. And that I was a lazy fuck and didn't deserve to take another breath. She said I abused her and beat her. I have never hit her or any other woman in my life. I am writing this letter to tell someone in the second letter she said that some how they had to get rid of me so they could be together. I found the second letter the day [she] and her mother went to Lancaster to a Christmas play and stayed over [night]. That was November 21st and wasn't coming home [until] late Nov 22nd. She called about 9:50 PM the [night] of the 21st. I went to bed about 11:00 PM. I could not sleep thinking about her and this guy. So about 1:00 AM the dogs went crazy and were looking out the door and there was this big guy looking in the window so I turned on the light and ask him who he was[.] He said his name was Lenny and that he wanted to talk about [Appellant]. I let him [in to] talk he told me he wanted [Appellant] to live with him. We sat and talked till 3:45 AM about [what] had been going on that he had been fucking her for about three months. I told him that I found the letter and I [knew] all about him and her and I would like to work it out with [Appellant] and try to get [things] back to the way we used to be. He said that he wanted her for his own. So we decided [to] let her make the decision. He left about 3:45 AM Friday morning. On Friday [night] [Appellant] and her mom got home I said we have to talk. She said ok so we sat down and I read the letter to her. She said that she was mad at me for not [taking] her anywhere or [doing] anything with her and that was why she was fucking this guy and wanted to live with him but couldn't pay me half of the value of the house [and] garage. That she thought that it would cost her 50 to 60 thousand dollars to pay

me off. She said that she made good money now that she was working at the bridge. So on Saturday Nov 23rd she went to see him and [break] it off with him and stay with me. She [was] gone from noon to six [o'clock;] that [night] she said that he pleaded with her to leave me. She said that she told him that she didn't want to lose [everything] and told him that she wanted to try to salvage [what] we had. So when she got home she told me that it was over and she was going to try to work things [out] with me. I said that I would try to forgive her and try to work things out with her. That [night] I started to think about it. She had to go to work. So I [lay] in bed and was thinking about all of this. I couldn't sleep so I [thought] about how this guy knew [where] we lived. I [asked Appellant] if she told him [where] we lived. She said she didn't. So I was thinking about how he just stood and was looking in the door at 1:00 A.M. and [thought] about how anybody could just walk in from the road and be on my front porch in the middle of the [night]. This [guy's] name is Lenny he is about 6 [feet] tall and is about 300 pounds has a big brown and grey beard and [wears] round [glasses] and skull cap, black leather jacket and jeans. He drives [a 1982] Ford pickup I don't know [what] color. So Saturday I went to get my 22 pistol and it was gone, I [thought] I would load it and put it on my [night] table in case he comes back[;] at least I would have some [protection.] I [asked Appellant where] the gun was [and] she said she didn't know. I said it was on my dresser. She said she didn't take [it.] I said there [was] just [she and I] here and I didn't take [it] so [where] did it get [to?] The guy told me [he] was a [convicted] felon [and he] also had on [rubber] gloves so he didn't leave finger prints anywhere. So I am think-

ing that maybe she gave him the gun to kill me with. That way no one would think [someone] killed [me,] that I [committed suicide]. Seeing it was my gun[.] So [that's] why I am writing this letter[,] in case I should end up shot by a 22 pistol. So nobody would think it was nothing but a suicide. I am going to put the letter I found with this letter. So if anything happens you have something to show the right people.

Signed Robert SANDT.

(Mr. Sandt's Letter, transcribed 12/19/02; R.R. 219a–228a).

¶ 6 Police questioned Appellant briefly at the scene and asked her to appear at the police station the next day for further questioning. Appellant stayed at her parents' house until 1:30 P.M. the next day. Then, she and her parents drove to the police station to meet with members of the Stroud Area Regional Police Department. Appellant spoke to detectives for about two and one half hours (1:50 P.M. to 4:20 P.M.). The detectives told Appellant she could leave the interview at any time, as she was not under arrest.

¶ 7 During the initial interview, Appellant made several highly incriminating admissions. The detectives informed Appellant of her *Miranda* rights. Appellant voluntarily waived her right to remain silent and the right to an attorney and continued to speak with the police. Essentially, Appellant admitted that for the past three months she had been having an affair with Mr. Fransen. Appellant wanted to leave Mr. Sandt and live with Mr. Fransen. Appellant told the police how on November 21, 2002, she went on an overnight trip with her mother. On the same night, Mr. Fransen made an unannounced visit to the marital home and asked Mr. Sandt to relinquish ties with Appellant. According to Appellant, Mr. Sandt responded that only Appellant could make

that decision. However, if Appellant left Mr. Sandt, he expected reimbursement in the amount of $50,000.00 to $60,000.00 for what he considered his share of the marital property.

¶ 8 Appellant confessed she and Mr. Fransen had been contemplating various options to get rid of Mr. Sandt. They discussed staging a drug overdose, a hunting accident, or a suicide. They referred to their objective as "the mission." Appellant's statements also placed Mr. Fransen at the crime scene. She explained how Mr. Fransen planned their actions on the night of the murder; Mr. Fransen telephoned Appellant to say he would be outside her home at around 10:00 P.M. Mr. Fransen instructed Appellant to exit the home and get in her car as if she were headed to work. Mr. Fransen further instructed Appellant to wait in the car until he came out of the house. Appellant said she thought Mr. Fransen wanted to "straighten out" Mr. Sandt. She admitted she followed Mr. Fransen's instructions. She saw Mr. Fransen walk to the front porch as she walked to her car. She heard a scuffle and gunshots. Then she gave Mr. Fransen a ride to the main road in her white Volkswagen Passat. Appellant further confessed that on her way home from work after her mother's call, Appellant disposed of letters and photographs linking her to Mr. Fransen. Appellant completed a written statement of her version of the events and later agreed to a taped interview.

¶ 9 Based on Appellant's statements and other evidence developed during the investigation, the police arrested Appellant and Mr. Fransen and charged them with the murder of Mr. Sandt.

¶ 10 Prior to trial, Appellant filed a motion to suppress her statements to police and a motion in *limine* to preclude the admission of Mr. Sandt's letter. The court

denied Appellant's motion to suppress her statements to police. The court granted in part and denied in part Appellant's motion in *limine,* ruling the letter was hearsay and inadmissible to prove the truth of the matters asserted. However, the court determined the letter was admissible to prove motive as well as the relationship between Appellant and Mr. Fransen. Appellant and Mr. Fransen were tried separately.

¶ 11 Appellant's trial began on January 6, 2004. On January 13, 2004, the jury found Appellant guilty of first degree murder as an accomplice, conspiracy to commit murder in the first degree, hindering apprehension, and solicitation to commit murder in the first degree. By order dated March 25, 2004, the court sentenced Appellant to life imprisonment on the first degree murder as an accomplice conviction, plus restitution, burial expenses, and costs related to prosecution and to other requirements of the sentencing order. The court declined to impose any further sentence on the remaining convictions.

¶ 12 On April 1, 2004, Appellant timely filed a notice of appeal. On March 31, 2005, this Court filed an opinion, which vacated the judgment of sentence and remanded the matter for a new trial on the ground that Mr. Sandt's letter constituted inadmissible hearsay, because it was in fact presented for the truth of the matter asserted, but did not qualify under the recognized exceptions to the hearsay rule.

¶ 13 The dissent disagreed with the majority's resolution of the hearsay question. The dissent reasoned that the letter was admissible, subject to the trial court's limiting instructions, as evidence of Mr. Sandt's opinion regarding his relationship with Appellant. The letter expressed Mr. Sandt's state of mind regarding the breakdown of his relationship with Appellant. The dissent concluded the letter was ad-

missible as evidence of Appellant's extra-marital affair with Mr. Fransen as well as Appellant's ill will, malice or motive to murder Mr. Sandt.

¶ 14 On April 6, 2005, the Commonwealth filed a petition for reargument *en banc.* Principally, the Commonwealth argued the letter was admissible at trial under the "state of mind" exception to the hearsay rule. By order dated May 27, 2005, this Court granted the Commonwealth's petition for reargument *en banc* and withdrew the panel decision.

¶ 15 In her substituted brief on reargument, Appellant presents three issues for our review:

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY ALLOWING THE COMMONWEALTH TO INTRODUCE INTO EVIDENCE AT TIME OF TRIAL AN ADMITTEDLY HEARSAY LETTER WRITTEN BY THE DECEDENT PREDICTING HIS DEATH AND STATING THAT IF HIS DEATH OCCURRED, IT WAS DUE TO THE ACTIONS OF [APPELLANT], HIS COMMON LAW WIFE?

DID THE SUPPRESSION COURT ERR AS A MATTER OF LAW WHEN IT FAILED TO SUPPRESS THE STATEMENTS AND THE FRUITS THEREOF, OBTAINED BY THE POLICE FROM [APPELLANT] WHILE IN CUSTODY AT THE POLICE STATION, WHICH STATEMENTS WERE OBTAINED IN THE ABSENCE OF HER *MIRANDA* RIGHTS?

DID THE TRIAL JUDGE ERR AS A MATTER OF LAW WHEN HE ALLOWED THE COMMONWEALTH TO INTRODUCE AT TIME OF TRIAL NUDE AND SEMI–NUDE PICTURES OF [APPELLANT] AND HER BOYFRIEND WHICH SERVED NO RELEVANT PURPOSE BUT MERE-

LY INFLAMED THE PASSIONS AND PREJUDICES OF THE JURY? (Appellant's Substituted Brief at 7).

¶ 16 In her first issue, Appellant argues the Commonwealth obtained a conviction by introducing improper evidence at trial. Specifically, Appellant contends Mr. Sandt's letter, predicting his death and implicating Appellant, is inadmissible hearsay. Initially, Appellant avers Mr. Sandt's letter was "testimonial" in nature; and under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the declarant of testimonial evidence must sit for cross-examination by the accused. Without the opportunity to cross-examine Mr. Sandt, Appellant claims she lost her right to confront her accuser, in violation of her constitutional right under the Confrontation Clause. Appellant maintains cross-examination of Mr. Sandt was the only way to test the reliability and veracity of his "testimonial" statements. Because Mr. Sandt was unavailable for cross-examination, his "testimonial" statements should have been deemed inadmissible at trial.

¶ 17 Appellant also contends Mr. Sandt's letter constituted inadmissible hearsay when analyzed under traditional Pennsylvania law, because the letter represents an out-of-court statement admitted to prove the truth of the matters asserted. Appellant posits the letter does not qualify under the standard hearsay exceptions known as "dying declaration," "excited utterance," "present sense impression," or "state of mind." (Appellant's Brief at 18).

¶ 18 According to Appellant, the "dying declaration" exception applies only to statements made when the declarant believes he is in fact dying. This case presented no evidence that Mr. Sandt was wounded, dying, or facing an immediate threat of death when he wrote the letter. No one knows when Mr. Sandt wrote the letter or whether he was the one who ripped it up and threw the letter away. (*Id.* at 19).

¶ 19 Additionally, Appellant claims Pennsylvania law bars admission of narrative letters as excited utterances, where the justification for the "excited utterance" exception necessitates a recent shocking or overpowering experience that makes the utterance likely to be truthful. Where the statement is in narrative form and refers to past events, it is not admissible as an excited utterance. (*Id.* at 19–20).

¶ 20 Appellant stresses the "present sense impression" exception to the hearsay rule does not apply to Mr. Sandt's letter, because the "present sense impression" exception requires the declarant to see the event and to make observations about it to another person present at the scene. The observations must be made at the time of the event, or very shortly after the event. Reliability is virtually assured by the coincidence of the event and the observations and by the fact that the observations were made to another person. Here, Mr. Sandt addressed his letter to persons unknown, who were not present, without coincidence of events and observations. (*Id.* at 20).

¶ 21 Appellant submits the "state of mind" exception to the hearsay rule does not apply to Mr. Sandt's letter, because the letter does not refer to statements made contemporaneously with the mental or physical condition described. Thus, statements concerning conversations or events which occurred weeks before the writing are too remote in time to represent the victim's state of mind. Notably, Appellant emphasizes Mr. Sandt's state of mind was not at issue in this case and cannot be used as evidence of Appellant's motive or state of mind, unless the statements were communicated to Appellant. Although the letter describes some discussions between Appellant and Mr. Sandt, his private fears were not discussed. In

short, the letter lost its probative value because it was too remote in time from Mr. Sandt's death, his fears were not communicated to Appellant, and the Commonwealth conceded Mr. Sandt was the one who ripped up the letter and threw it away. (*Id.* at 21–22).

¶ 22 In any event, Appellant maintains the letter was needlessly cumulative and unnecessary to establish Appellant's motive or her extramarital relationship with Mr. Fransen, given the other properly admitted evidence at trial, including letters from Appellant to Mr. Fransen, professing her love for him. The court should have excluded Mr. Sandt's letter, pursuant to its gate-keeping function, where the prejudicial effect of the letter was so great that no limiting instruction could cure the undue prejudice caused by admission of the letter at trial. Appellant concludes the court committed reversible error when it allowed the jury to consider Mr. Sandt's letter, and Appellant deserves a new trial as a result.

¶ 23 In response, the Commonwealth observes that an out-of-court statement may be admitted to establish motive, if the statement is not offered for the truth of the matter asserted. The Commonwealth claims it did not offer, and the trial court did not admit, Mr. Sandt's letter to prove the truth of matters asserted in the letter. To the contrary, the trial court admitted the letter for the limited purpose of establishing Appellant's relationship with Mr. Fransen and her motive to harm Mr. Sandt. The trial court's limiting instruction to the jury emphasized the narrow evidentiary use of the letter.

¶ 24 Even if Mr. Sandt's letter is hearsay, the Commonwealth argues the letter qualifies under the "state of mind" exception to the hearsay rule, because the letter informs the jury of Appellant's intent and motive, albeit through Mr. Sandt's state of mind. The Commonwealth also cites Pa.

R.E. 804(b)(6) ("forfeiture by wrong doing" hearsay exception). The Commonwealth contends Appellant should not benefit from Mr. Sandt's unavailability as a witness, where she was involved in securing his unavailability. The Commonwealth also urges admissibility of the letter under the "complete story" doctrine, because Mr. Sandt's letter (1) told the story of Appellant, Mr. Fransen, and Mr. Sandt, along with the natural progression of events leading to Mr. Sandt's murder, (2) provided evidence of a "prior bad act", and (3) gave the police a factual basis for their investigative decisions. Briefly, the Commonwealth submits Mr. Sandt's letter contributed to the "complete story" of the case by giving context to certain events near in time and place to Mr. Sandt's death.

¶ 25 Moreover, the Commonwealth tells us the court provided a carefully worded limiting instruction to ensure Mr. Sandt's letter would be used solely to demonstrate Appellant's motive and her relationship with Mr. Fransen, not for the truth of the matters asserted in the letter. Significantly, any unfair prejudice was outweighed by ample, otherwise properly admitted evidence of Appellant's guilt, including Appellant's own admissions. The Commonwealth concludes the letter was either properly admitted with a limiting instruction or, in the alternative, its admission constituted harmless error, in view of the overwhelming other evidence of Appellant's guilt. For the following reasons, we conclude the letter was improperly admitted at Appellant's trial, but its admission constituted harmless error.

¶ 26 The standard of review for admission of evidence is as follows:

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its

discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.

*Commonwealth v. Drumheller,* 570 Pa. 117, 135, 808 A.2d 893, 904 (2002), *certiorari denied,* 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003). *See also Commonwealth v. Lewis,* 885 A.2d 51, 54 (Pa.Super.2005).

Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Hunt,* 858 A.2d 1234, 1238 (Pa.Super.2004) (*en banc* ), *appeal denied,* 583 Pa. 659, 875 A.2d 1073 (2005) (internal citations and quotation marks omitted).

¶ 27 Initially we observe settled Pennsylvania law provides "a restraining principle that counsels against reaching a constitutional question if a non-constitutional ground for decision is available." *Com., Dept. of Transp. v. Taylor,* 576 Pa. 622, 633, 841 A.2d 108, 114 (2004) (citing *P.J.S. v. Pennsylvania State Ethics Com'n,* 555 Pa. 149, 153, 723 A.2d 174, 176 (1999)). *See also Commonwealth v. Kennedy,* 583 Pa. 208, 876 A.2d 939 (2005) (declining to address merit of appellant's Sixth Amendment Constitutional claim because matter was decided under state law work-product doctrine). In deference to this rule, we will address Appellant's arguments in reverse order. *See P.J.S., supra.*

¶ 28 Pennsylvania Rule of Evidence 801 defines hearsay as follows:

**Rule 801. Definitions**

**(a) Statement.** A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

**(b) Declarant.** A "declarant" is a person who makes a statement.

**(c) Hearsay.** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Pa.R.E. 801. Pennsylvania Rule of Evidence 803 provides exceptions to the hearsay rule and states, in pertinent part:

**Rule 803. Hearsay exceptions; availability of declarant immaterial**

The following statements, as hereinafter defined, are not excluded by the hearsay rule, even though the declarant is available as a witness:

**(1) Present sense impression.** A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

**(2) Excited utterance.** A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

**(3) Then existing mental, emotional, or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. A statement of memory or belief offered to prove the fact remembered or believed is included in this exception only if it

relates to the execution, revocation, identification, or terms of declarant's will.

Pa.R.E. 803. *See Commonwealth v. Gray,* 867 A.2d 560 (Pa.Super.2005), *appeal denied,* 583 Pa. 694, 879 A.2d 781 (2005) (applying "present sense impression" exception to hearsay rule only if declarant had no opportunity to form purpose of misstating observation). *See Commonwealth v. Hood,* 872 A.2d 175, 181 (Pa.Super.2005), *appeal denied,* 585 Pa. 695, 889 A.2d 88 (2005) (stating "excited utterance" exception to hearsay rule admits statements made while declarant was under stress of excitement caused by event or condition related to startling event); *Commonwealth v. Carmody,* 799 A.2d 143 (Pa.Super.2002) (describing excited utterance as "a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its being emanated in whole or in part from his reflective faculties").

¶ 29 Additionally, when the declarant is unavailable, the rules of evidence provide:

**Rule 804. Hearsay exceptions; declarant unavailable**

* * *

**(b) Hearsay Exceptions.** The following statements, as hereinafter defined, are not excluded by the hearsay rule if the declarant is unavailable as a witness:

* * *

(2) *Statement under belief of impending death.* A statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death.

* * *

(6) *Forfeiture by wrongdoing.* A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

Pa.R.E. 804. *See Commonwealth v. Griffin,* 453 Pa.Super. 657, 684 A.2d 589, 591–92 (1996) (stating use of "dying declaration" exception to hearsay rule "depends on all surrounding circumstances" and applies in murder trial "if the declarant identifies his attacker, the declarant believes he is going to die, death is imminent, and death actually results"). *See Commonwealth v. Santiago,* 822 A.2d 716, 729 (Pa.Super.2003), *appeal denied,* 577 Pa. 679, 843 A.2d 1237 (2004), *cert. denied,* 542 U.S. 942, 124 S.Ct. 2916, 159 L.Ed.2d 820 (2004) (stating "forfeiture by wrongdoing" exception to hearsay rule applies when accused's criminal wrongdoing was committed with intent to make witness unavailable to testify; the exception does not apply when defendant murdered victim not to prevent him from testifying but because of personal animosity) (citing *Commonwealth v. Laich,* 566 Pa. 19, 28 n. 4, 777 A.2d 1057, 1062 n. 4 (2001)).

¶ 30 Regarding the "state of mind" exception to the hearsay rule under Rule 803(3), our Supreme Court has stated:

Pursuant to the state of mind hearsay exception, where a declarant's out-of-court statements demonstrate [the declarant's] **state of mind,** are made in a natural manner, and are material and

relevant, they are admissible pursuant to the exception. Out-of-court declarations that fall within the state of mind hearsay exception are still subject to general evidentiary rules governing competency and relevancy. Accordingly, whatever purpose the statement is offered for, be it to show **the declarant's** intention, familiarity, or sanity, that purpose must be a "factor in issue," that is, relevant. Evidence is relevant if it logically tends to establish a material fact in the case, if it tends to make a fact at issue more or less probable, or if it supports a reasonable inference or presumption regarding the existence of a material fact.

*Id.* at 26, 777 A.2d at 1060–61 (emphasis added). In other words, the declarant's state of mind must be relevant. *Id.* Where, however, the declarant's state of mind is not a factor at issue in the case, the declarant's statement is immaterial and irrelevant to the prosecution's case. *Commonwealth v. Thornton,* 494 Pa. 260, 431 A.2d 248 (1981).

¶ 31 In *Thornton,* the declarant-victim's statement was admitted at trial under the "state of mind" exception to the hearsay rule. The challenged testimony was given by the police officer who responded to a domestic altercation the night before the victim was killed. Over defense objection, the police officer testified at trial that the victim told police the victim was carrying a gun for protection from the Thornton brothers, who were after him. *Id.* The statement was offered to prove the victim feared the defendant. Although the statement was hearsay, the trial court admitted the testimony as evidence of the declarant-victim's state of mind. *Id.* On appeal, and in response to the Commonwealth's assertion that the declarant-victim's statement was admissible to establish the victim's fear and came within the "state of

mind" exception to the rule against hearsay, our Supreme Court reasoned:

It is true that the declaration perhaps tends to establish that the [declarant-victim] was fearful of the Thorntons. However, the [declarant-victim's] state of mind was not a matter in issue in this case. It was appellant's state of mind, not that of the victim, which was material to establish the degree of guilt, if any, on the charge of criminal homicide.

Only when the declaration is considered for the truth of the matter asserted, that appellant and his brother "were after" the [declarant-victim], does the declaration become relevant, that is, both material to and probative of appellant's intent to kill. However, when considered for its substantive truth, the declaration, although relevant, is incompetent and hence inadmissible because it is hearsay not within any exception. Thus, appellant's objection to admission of the declaration should have been sustained and the testimony excluded.

*Id.* at 265, 431 A.2d at 251 (internal citation omitted). Although the Court held the victim's statement was inadmissible hearsay, the Court further held:

Given the overwhelming evidence of an intentional killing...there is no reasonable possibility that the trial court's erroneous evidentiary ruling could have contributed to the jury's verdict. Thus, the error is harmless and the jury's verdict may not be disturbed.

*Id.* at 268, 431 A.2d at 252. *Compare Commonwealth v. Puksar,* 559 Pa. 358, 368, 740 A.2d 219, 225 (1999), *cert. denied,* 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 42 (2000) (admitting testimony at trial from witness who overheard dispute between victim and accused, because fact that dispute occurred demonstrated ill-will between victim and accused as well as accused's motive for killing victim; tes-

timony did not pertain to truth of subject matter of dispute but only to fact that dispute occurred); *Commonwealth v. Chandler*, 554 Pa. 401, 721 A.2d 1040 (1998) (deeming issue waived on other grounds, but discussing admissibility of testimony by victim's family and co-workers limited to their eyewitness observations of physical signs of abuse, which were not hearsay, and statements of victim limited to her negative feelings about accused and her marriage to him); *Commonwealth v. Sneeringer* 447 Pa.Super. 241, 668 A.2d 1167 (1995), *appeal denied*, 545 Pa. 651, 680 A.2d 1161 (1996) (affirming trial court's decision to allow witness to testify about victim's stated intention to sever relationship with accused; evidence of victim's intent to end relationship allowed jurors to infer accused's motive for killing victim).

¶ 32 Furthermore, our Supreme Court has interpreted the common law "special circumstance" doctrine as applicable under very limited circumstances:

Evidence of distinct crimes is not admissible against a defendant being prosecuted for another crime solely to show his bad character and his propensity for committing criminal acts. However, evidence of other crimes and/or violent acts may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character. As we recently stated . . . :

[T]he general rule prohibiting the admission of evidence of prior crimes nevertheless allows evidence of other crimes to be introduced to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

This list of "special circumstances" is not exclusive, and this Court has demonstrated it will recognize additional exceptions to the general rule where the probative value of the evidence outweighs the tendency to prejudice the jury.

. . .

Another "special circumstance" where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. This special circumstance, sometimes referred to as the *"res gestae"* exception to the general proscription against evidence of other crimes, is also known as the "complete story" rationale, *i.e.*, evidence of other criminal acts is admissible to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.

*Commonwealth. v. Lark*, 518 Pa. 290, 302–303, 543 A.2d 491, 497 (1988) (admitting into evidence at trial interwoven threats, intimidations, and criminal activities relevant to prove motive, intent, and identity; because of logical connection between crimes, proof of one naturally tended to demonstrate proof of another) (internal citations omitted).

¶ 33 In the instant case, the trial court responded to Appellant's objection to the admission of Mr. Sandt's letter as follows:

[Appellant] alleges that this letter is hearsay and fails to qualify for any of the enumerated hearsay exceptions pursuant to the Pennsylvania Rules of Evidence. We agree. Therefore, this letter will be excluded from evidence for purpose of proving the truth of the matter asserted, that being that Appellant participated in the murder of the victim. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. The letter written by the victim, which implicated [Appellant and Mr. Fransen], meets this definition. It was not made by the victim through the testimony at a trial or hearing and it is being offered to prove [Appellant's] involvement in the murder of the victim. However, "when an extrajudicial statement is offered for a purpose other than proving the truth of its contents, it is not hearsay and is not excludable under the hearsay rule." [*Puksar, supra* at 225.] Extrajudicial statements are "admissible to establish ill-will or motive where they are not being offered for the truth of the matter contained therein." [*Id.*] Therefore, we conclude that the letter written by the victim is admissible as evidence of a prior relationship between [Appellant and Mr. Fransen]. Furthermore, this letter is admissible as evidence of [Appellant's] motive to cause harm to the victim based on her relationship with another man and her allegations of the victim's abusive conduct towards her.

(Omnibus Pre-trial Motion Opinion, dated June 16, 2003, at 17–18) (some internal citations omitted).

¶ 34 We agree with the trial court that the letter constituted inadmissible hearsay. We disagree, however, with the court's decision to admit the letter under *Puksar* for the following reasons. In his letter, Mr. Sandt wrote about the relationship between Appellant and Mr. Fransen and referred to: Appellant's allegations of spousal abuse; Appellant's desire to further her relationship with Mr. Fransen; Mr. Sandt's own demand for his share of the marital property; and, the possible nexus between Appellant and Mr. Fransen, and Mr. Sandt's missing .22 caliber revolver. Unlike the extrajudicial statement in *Puksar,* the evidentiary value of Mr. Sandt's letter depended on the truth of its content. *See Thornton, supra.* The mere existence of the letter itself was not enough to prove Appellant's relationship with Mr. Fransen or her motive to kill Mr. Sandt. Here, the jurors had to believe the actual text of the letter, that is, the matters asserted in it, to grasp what the letter was offered at trial to prove. *See id.* We conclude the letter was hearsay, *Thornton* controls, and *Puksar* does not apply.

¶ 35 Therefore, as hearsay, Mr. Sandt's letter was admissible only if it fell within a recognized exception to the hearsay rule. *See* Pa.R.E. 803, 804. The letter does not serve as a present sense impression, because Mr. Sandt did not write the letter as he perceived the events related in the letter or immediately thereafter. In fact, we do not know when Mr. Sandt wrote the letter. Thus, he might have had ample opportunity to form the purpose to misstate the facts contained in the letter. *See* Pa.R.E. 803(1); *Gray, supra.*

¶ 36 Likewise, the "excited utterance" exception to the hearsay rule does not apply in this case, because Mr. Sandt's letter recounts a series of past events. The letter does not describe a startling event. Again, absent evidence of when Mr. Sandt wrote the letter, we cannot analyze whether he wrote the letter under the stress of excitement caused by some

shocking occurrence or whether it "emanated from his reflective faculties." *See* Pa.R.E. 803(2); *Hood, supra; Carmody, supra.*

¶ 37 Furthermore, the "dying declaration" exception to the hearsay rule does not apply. Mr. Sandt's letter does not identify an "attacker." Instead, the letter suggests to the reader that if some untoward event should happen to Mr. Sandt, the doer might be Mr. Fransen. Mr. Sandt's letter does not suggest that his death is imminent. The letter simply proposes suspects if his death should occur and a possible murder weapon. *See* Pa. R.E. 804(b)(2); *Griffin, supra.*

¶ 38 Additionally, there is no evidence to suggest Appellant and Mr. Fransen murdered Mr. Sandt to procure his unavailability as a witness at his own murder trial. To the contrary, the letter insinuates only personal animosity. Therefore, the hearsay exception of "forfeiture by wrongdoing" does not apply to the letter. *See* Pa.R.E. 804(b)(6); *Santiago, supra.* Accordingly, Mr. Sandt's letter does not fit within the "present sense impression," "excited utterance," "dying declaration," or "forfeiture by wrongdoing" exceptions to the hearsay rule.

¶ 39 The "state of mind" exception to the hearsay rule presents a more problematic analysis. We first observe that Mr. Sandt's letter was offered as evidence of **Appellant's** "state of mind." However, the "state of mind" exception traditionally applies to the declarant's state of mind, emotion, sensation or physical condition such as intent, plan, motive, design, mental feeling, pain, and bodily health. *See* Pa. R.E. 803(3). Under the common application of this hearsay exception, Mr. Sandt's letter could be used to establish his own state of mind, but not Appellant's state of mind. Mr. Sandt's state of mind was not a matter at issue in this case. Only when Mr. Sandt's letter is considered for the truth of the matter asserted, does it becomes relevant, that is material to and probative of Appellant's intent or motive to kill Mr. Sandt. *See Thornton, supra.* However, when considered for its substantive truth, although relevant, the letter is incompetent and therefore inadmissible. *See id.* To the extent the letter serves to reveal Mr. Sandt's memory or belief under the "state of mind" exception to the hearsay rule, the letter must relate to the execution, revocation, identification, or terms of Mr. Sandt's will, which the letter does not. *See* Pa.R.E. 803(3). Thus, the letter was inadmissible under the "state of mind" exception as traditionally applied.

¶ 40 We recognize that in *Chandler, supra* and *Sneeringer, supra* the appellate Courts affirmed the trial court's decision to admit, under the "state of mind" exception, third-party testimony about a victim's statements regarding her relationship with the accused, as evidence of the accused's intent, motive or ill will toward the victim. *See also Commonwealth v. Stallworth,* 566 Pa. 349, 781 A.2d 110 (2001) (affirming trial court's decision to admit victim's Protection From Abuse application, made one day before she was killed; petition included specific allegations involving threats made by accused to victim; Supreme Court held allegations were probative of accused's intent and motive to harm victim; PFA evidence was also indicative of victim's state of mind regarding accused and her relationship with him as she perceived it; allegations in PFA application were further supported by testimony of eight eyewitnesses to accused's threats, as evidence of accused's ill will toward victim and to show nature of relationship between accused and victim). In each case, the victim's statements demonstrated the victim's intent to end a relationship with the accused, which allowed the jury to infer

the accused's motive to kill the victim. *See Chandler, supra; Sneeringer, supra.* In *Stallworth* and *Chandler*, there was also independent eyewitness testimony on the nature of the relationship between the victims and the defendants.

¶ 41 The letter in the instant case does not generate the same probative value as the victims' statements in the cited cases. Here, Mr. Sandt's letter is mostly his commentary on the relationship between the codefendants. In fact, the trial court admitted the letter as evidence of the relationship between Appellant and Mr. Fransen. On the other hand, the letter conveys a very mixed message regarding the state of the relationship between Appellant and Mr. Sandt, vacillating between possible separation and promises of reconciliation. Significantly, the letter does not contain any threats made on Mr. Sandt's life, by either Appellant or Mr. Fransen. At most, the letter represents pure conjecture well-seasoned with romantic hyperbole.

■ ¶ 42 Moreover, we reject the Commonwealth's *res gestae* argument to justify admission of the letter at trial as evidence of the "complete story" of the case. Given the tentative nature of the letter, its admission at trial does not serve any of the legitimate purposes identified in *Lark, supra.* Instead, Mr. Sandt's letter generates only a weak prediction of his possible murder and Appellant's motive, intent, common scheme or plan. While some portions of the letter might be read as a possible motive to harm Mr. Sandt, the unconfirmed nature of the letter prohibits its use as proof that Appellant actually intended to murder Mr. Sandt. *Id.* Further, Mr. Sandt's letter fails to describe specific prior criminal acts or to serve as a complete story of the crime on trial. Therefore, the letter does not meet the "complete story" concept described in *Lark, supra,* where evidence of other crimes may be relevant and admissible as part of the chain or sequence of events which became the history of the case and formed the natural development of the facts. *See id.* Thus, under the Pennsylvania Rules of Evidence, the letter should have been excluded at trial. *See Thornton, supra; Lark, supra.*[7]

---

7. Appellant's Sixth Amendment Confrontation Clause argument under *Crawford, supra,* implicates constitutional concerns. The United States Supreme Court in *Crawford* stated: "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 61, 124 S.Ct. at 1370, 158 L.Ed.2d at 199. Thus, when "testimonial statements" are at issue, the Confrontation Clause of the Constitution of the United States precludes the use of hearsay except in the most limited of circumstances. The *Crawford* rule, however, does not apply to "non-testimonial" statements. "Where non-testimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law...and [exempt] such statements from Confrontation Clause scrutiny altogether." *Id.* at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203. The *Crawford* Court declined to define the term "testimonial" but stated: "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* The *Crawford* Court suggests there might be other situations which also give rise to "testimonial" statements. *See, e.g., Commonwealth v. Dargan,* 897 A.2d 496, 502–03 (Pa.Super.2006) (observing crucial distinction between testimonial and non-testimonial statements for *Crawford* purposes "seems to lie in whether they were the product of interrogation or specific inquiry of almost any sort or were voluntary"; what is critical is whether declarant deliberately made statements with view to later prosecutorial use). Nevertheless, we need not decide whether Mr. Sandt's letter is non-testimonial or whether it falls within some amorphous gray area of "testimonial" statements, as Appellant contends. Because we have decided the letter

¶ 43 Despite the decided inadmissibility at trial of Mr. Sandt's letter, "Not all violations of the accused's right to confront his witnesses result in reversible error. The appropriate standard for review under these circumstances is the harmless error test as set forth in *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978)." *Commonwealth v. Marinelli*, 547 Pa. 294, 328, 690 A.2d 203, 220 (1997), *cert. denied*, 523 U.S. 1024, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1998). This Court commented on the harmless error test stating: "Not all errors at trial, however, entitle an appellant to a new trial, and [t]he harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial. . . ." *Commonwealth v. West*, 834 A.2d 625, 634 (Pa.Super.2003), *appeal denied*, 586 Pa. 712, 889 A.2d 1216 (2005) (quoting *Commonwealth v. Drummond*, 775 A.2d 849, 853 (Pa.Super.2001), *appeal denied*, 567 Pa. 756, 790 A.2d 1013 (2001) (internal citations and quotations omitted)). Additionally:

> The Commonwealth bears the burden of establishing the harmlessness of the error. This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Passmore*, 857 A.2d 697, 711 (Pa.Super.2004), *appeal denied*, 582 Pa. 673, 868 A.2d 1199 (2005) (quoting *Laich, supra* at 29, 777 A.2d at 1062–63).

¶ 44 In the instant case, on November 28, 2002, Appellant was advised of her *Miranda* rights and submitted to an audiotaped custodial interrogation with two detectives. The transcripts from this interrogation reveal Appellant confessed the following: she had been engaged in a romantic relationship with Mr. Fransen; she told Mr. Fransen that Mr. Sandt treated her poorly; she and Mr. Fransen explored different scenarios, in letters and telephone conversations, that would result in Mr. Sandt's demise, including a staged "hunting accident," "drug overdose," or "suicide"; occasionally, she and Mr. Fransen referred to their plans to get rid of Mr. Sandt as "the mission"; she gave Mr. Fransen Mr. Sandt's .22 caliber revolver; she and Mr. Fransen agreed that, on the night of the murder, Mr. Fransen would "straighten out" Mr. Sandt while Appellant waited in her car; she also agreed to give Mr. Fransen a ride to the end of her driveway; as she sat in her car, she heard "scuffling," followed by several gunshots; she drove Mr. Fransen from the murder scene to the end of her driveway; she disposed of letters written by Mr. Fransen, which discussed harming Mr. Sandt. (Transcript of Interview with Detectives, 11/28/02, R.R. 118a–132a). Appellant freely confessed to how and why Mr. Fransen murdered Mr. Sandt. Appellant's confession unequivocally implicated her in the death of Mr. Sandt.

¶ 45 At trial, the Commonwealth presented ample and otherwise properly admitted evidence regarding the matters asserted in Mr. Sandt's letter. The following chart identifies where the matters asserted in the letter were presented at trial through independent competent evidence:

was inadmissible on non-constitutional state law grounds, we decline to address Appellant's constitutional claim under *Crawford. See P.J.S., supra.*

| Matters asserted in Mr. Sandt's letter | Matters presented at trial |
|---|---|
| Appellant wrote letters to Mr. Fransen, discussing plans to harm Mr. Sandt. | (N.T. Trial, 1/7/04, at 95); (N.T. Trial, 1/8/04, at 82, 86, 88, 90-91); (N.T. Trial, 1/9/04. at 13-16, 47-49) (independent trial testimony regarding Appellant's admissions and love letters to and from Mr. Fransen, retrieved from trash dumpster, at Appellant's direction). |
| Appellant and Mr. Fransen discussed murdering Mr. Sandt. | (N.T. Trial, 1/7/04, at 96-07, 130) (independent trial testimony regarding Appellant's and Mr. Fransen's plans and options to murder Mr. Sandt without being suspected of murder). |
| On November 21, 2002, Mr. Fransen visited Mr. Sandt's house at 1:00 A.M., while Appellant was out of town with her mother. | (*Id.* at 98-99) (independent trial testimony on the subject of Mr. Fransen's, unannounced, late night visit to Mr. Sandt and an account of their conversation). |
| Mr. Sandt became suspicious about how Mr. Fransen knew the location of his home. | (*Id.* at 136-138); (N.T. Trial, 1/12/04, at 50-51) (independent trial testimony concerning map drawn by Appellant for Mr. Fransen to help him find Appellant's home without being seen by neighbors). |
| Mr. Sandt could not find his .22 caliber revolver. | (N.T. Trial, 1/7/04, at 92, 143-44) (independent trial testimony regarding Appellant taking Mr. Sandt's .22 caliber revolver and giving it to Mr. Fransen). |

¶ 46 The Commonwealth also presented the hand-drawn map, with detailed notes, that Appellant had prepared for Mr. Fransen. The map and notes advised Mr. Fransen how to locate and access Mr. Sandt's residence while avoiding neighbors, fences, dogs, and security devices, such as motion activated lights. Even without the letter, Appellant's confession and other trial evidence proved Appellant's guilt beyond a reasonable doubt. In other words, Mr. Sandt's letter was merely cumulative of other untainted evidence. *See Passmore, supra.* Given the overwhelming evidence of Appellant's guilt, the court's evidentiary ruling to admit the letter was harmless error. *See West, supra.* Thus, we decline to disturb the jury's verdict on this basis.

¶ 47 In her second issue, Appellant contends the Commonwealth elicited Appellant's inculpatory statements during a "custodial" interrogation at the police station, before the police administered her *Miranda* warnings. The subsequent *Miranda* warning cannot cure the defect of the initial interrogation. Specifically, Appellant contends the Commonwealth began a custodial interrogation of Appellant as soon as she arrived at the Stroud Area Regional Police Department Headquarters. Appellant maintains her inculpatory admissions should have been suppressed because the interrogation technique employed by the police—questions first, *Miranda* warnings second—violated her constitutional rights. Appellant identifies multiple factors to support her contentions that her initial interaction with the police was custodial, including: (1) when she first arrived at her home, Appellant was not permitted to enter and was told to remain at her parents' home next door; (2) while at her parents' home, police entered freely and questioned Appellant, and she was told to surrender her clothing to police; (3) upon arrival at the police station, Appellant was the focus of an investigation; (4) the interrogation at the

police station occurred with armed detectives in a locked, windowless room; (5) the police would not allow her to leave, thereby extending the duration of Appellant's detention and causing her sleep deprivation. Under these circumstances, Appellant insists her statements and the results thereof were obtained in violation of her constitutionally protected right against self-incrimination, as expressed by Amendment V of the Constitution of the United States. Appellant claims the suppression court committed reversible error when it refused to suppress Appellant's inculpatory statements and the evidence obtained as a result. Appellant concludes the violation of her Constitutional rights warrants a new trial.

¶ 48 In response to Appellant's second issue, the Commonwealth argues the suppression court properly admitted Appellant's statements to police. Appellant went to the police station voluntarily; police advised her that she was not under arrest and could leave at any time; she was not searched; the interview room door remained ajar during the interview; Appellant did not ask to leave. Appellant made the statements after she was informed that she was free to leave. Appellant received *Miranda* warnings after she placed herself at the crime scene. Appellant acknowledged her *Miranda* rights, waived her right to remain silent and her right to an attorney, and repeated her inculpatory statements. The Commonwealth concludes the non-custodial nature of the initial conversation vitiated any possible taint, and Appellant is not entitled to a new trial on this basis.

▆▆▆▆▆ ¶ 49 Review of the court's decision to deny a suppression motion implicates the following principles:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Our scope of review is limited:
>
> > [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Jones,* 874 A.2d 108, 115 (Pa.Super.2005) (internal citations and quotation marks omitted).

▆▆▆▆ ¶ 50 Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of her *Miranda* rights. *Commonwealth v. DiStefano,* 782 A.2d 574, 579 (Pa.Super.2001), *appeal denied,* 569 Pa. 716, 806 A.2d 858 (2002). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda, supra* at 444, 86 S.Ct at 1612, 16 L.Ed.2d at 706.

> Whether a person is in custody for *Miranda* purposes depends on whether the person is physically [deprived] of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted.

*Commonwealth v. Williams,* 539 Pa. 61, 74, 650 A.2d 420, 427 (1994) (internal citations omitted).

> Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.
>
> The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring *Miranda* warnings.

*Commonwealth v. Mannion,* 725 A.2d 196, 200 (Pa.Super.1999) (*en banc*) (internal citations omitted). *See also Commonwealth v. Peters,* 434 Pa.Super. 268, 642 A.2d 1126, 1130 (1994) (*en banc*), *appeal denied,* 538 Pa. 668, 649 A.2d 670 (1994) (stating fact that defendant was focus of investigation is relevant for custody determination but does not *per se* require *Miranda* warnings). Whether a person is in custody for *Miranda* purposes must be evaluated on case-by-case basis with due regard for the facts involved. *Mannion, supra* at 202.

¶ 51 In the instant case, the trial court explained its decision to deny Appellant's motion to suppress her admissions to police as follows:

> [Appellant] alleges that she was in police custody from sometime in the early morning hours of November 28, 2002 until the time her taped interview was concluded at the Day Street Police Station after 6:00 P.M., on the same day. [Appellant] further alleges that because she was not given the *Miranda* warnings until 4:20 P.M., on November 28, 2002, her statements were improperly elicited and should be suppressed at trial.
>
> The fact that a police investigation has focused on a particular individual does not automatically trigger "custody" thus requiring *Miranda* warnings. In order to be "in custody," a person must believe that he is not free to leave. Where a defendant does not feel free to leave the interview room during questioning, any confession elicited is done so with the defendant in custody. In *Commonwealth v. Rodriguez* [, 330 Pa.Super. 295, 479 A.2d 558 (Pa.Super.1984)], the Court held that [an appellant] was not in custody where he voluntarily accompanied the police in an unmarked police car and was left alone in a small interrogation room for thirty-five minutes. The Court concluded that there was no evidence that the door to the interrogation room was locked or that the defendant ever expressed a desire to leave the room.
>
> The facts of *Rodriguez* are similar to those of the instant matter. [Appellant] voluntarily went to the police station with her parents. She was placed in an interview room for ten minutes prior to the commencement of questioning. There is conflicting testimony between [Appellant] and Detective Schmidt as to whether the door to the interview room was locked. [Appellant] testified that she was locked in the room the whole time. Detective Schmidt testified that the door was never even closed. When asked on cross-examination whether she

ever complained that the interview room door was locked, [Appellant] stated that she did not because she assumed the police locked it deliberately. [Appellant] admitted that she was told that she was free to leave at any time. We conclude that there is insufficient evidence for a holding that [Appellant] felt she was not free to leave the interview room on November 28, 2002.

In support of her argument, [Appellant] provided the court with a copy of *Commonwealth v. McCarthy*, [820 A.2d 757 (Pa.Super.2003) ]. We find that the facts of *McCarthy* are substantially different and are distinguishable from the instant matter. The defendant in *McCarthy*, unlike [Appellant] in the instant matter, specifically asked to speak to an attorney before answering any questions. The defendant testified that the detective interviewing her responded "no, this is my window of opportunity; and if I walked through that door he would make sure that all the charges stuck and he would embarrass me in front of my friends. That's when I sat down." In the instant matter, there were no such threats made to [Appellant].

[Appellant] also alleges the following in her Omnibus Pre–Trial Motion in regard to the duration of what she terms a detention:

9. [Appellant's] statements were a product of unconstitutional and coercive procedures including sleep deprivation and promises of future treatment.

10. At the time of [Appellant's] statements, she was so deprived of sleep and food that her statement was not knowing and voluntary.

(Omnibus Pre–Trial Motion, March 20, 2003, at 3). In determining voluntariness, the question is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of [her] ability to make a free and unconstrained decision to confess. The totality of the circumstances [is] to be evaluated in determining whether a statement is voluntary. The relevant factors include the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

The first issue is whether [Appellant] had been sleep deprived by the police. [Appellant] went to work on November 26, 2002 at 10:00 P.M., and left at 7:00 A.M., on November 27, 2002. She slept from 8:00 A.M., to 12:00 noon [on November 27]. [Appellant] did not sleep again until after the police interview, which commenced at 1:50 P.M., on November 28, 2002. Thus, [Appellant] had not slept in approximately twenty-six hours when she was given the *Miranda* warning. However, the fact that [Appellant] had not slept for a long period of time is not determinative of the sleep deprivation issue. We must also determine whether police conduct was the cause of [Appellant's] inability to sleep. Detective Schmidt testified at the omnibus hearing that [Appellant] did not appear tired or confused at the time of the interview on November 28, 2002. [Appellant] testified that she only slept four hours in the forty-three hours prior to the interview. However, [Appellant] did not give any testimony that she was tired during the interview. Furthermore, [Appellant] did not testify that she ever informed the detectives interviewing her that she was tired. It is apparent that [Appellant's] job puts her on

an unusual sleep schedule. [Appellant] works an overnight shift and sleeps during the day. It has not been made clear how long [Appellant] normally goes between sleep. [Appellant] has simply failed to convince this court that she was sleep deprived at the time of the interview. Even if [Appellant] was sleep deprived at the time of the interview, [Appellant] has failed to show that the police prevented her from sleeping while at her parents' house. Furthermore, [Appellant] does not allege that she ever expressed to the police that she needed sleep. Therefore, her statements cannot be suppressed on that ground.

[Appellant] alleges that there were "promises of future treatment" made to her. [Appellant] has failed to give any specific information as to promises that were made to her. Additionally, Detective Schmidt testified at the omnibus hearing that no one made any promises or threats to [Appellant].

[Appellant] also alleges that she was deprived of food at the time of the interview. It is undisputed that [Appellant] was given a hoagie and a soda sometime after 5:00 P.M., on November 28, 2002. This occurred after several hours of questioning and after [Appellant] was *Mirandized.* However, [Appellant] has not alleged that she had gone a substantial amount of time without food. The interview did not commence until 1:50 P.M. [Appellant] was at her parents' house from the time she got home in the early morning hours of November 28, until the time they left for the police station at 1:30 P.M. [Appellant] does not allege that she did not have ample opportunity to eat prior to the interview. We conclude that the detectives were not required to offer [Appellant] food during the mid-afternoon hours of November 28, 2002.

We will now address the six factors set forth by [Appellant] in her brief in support of her argument that a custodial interrogation did take place. The first factor is the basis for the detention. We agree with [Appellant] that she clearly was the focus of the investigation from an early point. However, this by itself does not create the assumption of a custodial interrogation. *Mannion, supra.* The second factor is the duration of the detention. [Appellant] argues that the detention began in the early morning hours of November 28, 2002, based on the fact that she was effectively prevented from leaving the crime scene. We disagree. This was a situation in which a reasonable person would believe [she] was "at liberty to ignore the police presence and go about [her] business." *Commonwealth v. Witherspoon,* 756 A.2d 677, 680 (Pa.Super.2000). [Appellant] was in her parents' house and the police investigation focused on [Appellant's] house, not her parent[s'] house. The police did not prevent [Appellant] from going about her business. At no time did [Appellant] attempt to leave her parent[s'] house or even ask if she could leave. She merely was prevented from accessing her car, as it was part of the investigation. We conclude that the interview commenced at the time [Appellant] was brought into the interview room at the police station at 1:50 P.M. [Appellant] was *Mirandized* at 4:20 P.M. Thus, [Appellant] was interviewed for only two-and-one-half hours prior to being given the *Miranda* warnings.

The third factor concerns the location of the interview. We agree with [Appellant] that the interview was conducted in an interview room at a police station. The fourth factor concerns how [Appellant] was transported to the police station. [Appellant] argues that she had no choice but to go to the police station and

the police had no reason to think that her parents would help her flee. It is undisputed that the police requested [Appellant's] presence at the police station and that the police left the vicinity of the crime scene after making such request. No one prevented [Appellant] from staying at her parent[s'] house or going somewhere other than the police station. Therefore, we conclude that [Appellant] was not coerced into going to the police station on November 28, 2002.

The fifth factor deals with show, threat or use of force. [Appellant] argues that the large police presence at the crime scene prevented her from leaving her parents' house. Mere police presence is insufficient to conclude that coercion took place. "In order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 2389[, 115 L.Ed.2d 389, 401–02] (1991). We find the following facts to be supportive of [Appellant's] argument: (1) [Appellant's] car was boxed in by police cars such that she would have been unable to leave; (2) [Appellant] was not allowed to open her car to retrieve a pack of cigarettes; (3) the police entered and exited [Appellant's] parents' house constantly through the time they were investigating the crime scene; and (4) [Appellant] was requested to turn her clothes over to police. However, neither [Appellant] nor her parents ever refused to cooperate with police, ever asked the police to leave their house, ever asked the police to move their vehicles, or ever attempt-

ed to leave the area. Furthermore, there was no formal interview of [Appellant] during the time she remained in her parent[s'] house. While it is true that the police entered and exited the house many times, [Appellant] was never formally interviewed as to the events of November 27, 2002 until she arrived at the police station on November 28, 2002. In fact, Detective Wolbert testified that [Appellant] was free to go about wherever she wanted at the time of the investigation of the crime scene. Therefore, we conclude that custody did not begin until sometime during the interview of [Appellant] at the police station.

The sixth factor inquires into the methods of investigation used. [Appellant] argues that the interrogation was lengthy and confrontational, with Detectives Miller and Schmidt using police tactics to elicit inculpatory evidence from [Appellant]. [Appellant] does not reference... any specific incidences of police conduct or how such conduct violated any constitutional right.

Finally, we agree with the Commonwealth that even if the police should have *Mirandized* [Appellant] at the beginning of the interview, the subsequent issuing of *Miranda* warnings[,] coupled with the fact that there is no evidence of coercive or improper police tactics[,] allow the admission of [Appellant's] statements. *Commonwealth v. DeJesus,* [567 Pa. 415,] 787 A.2d 394 (2001). The *De-Jesus* Court held:

> [W]e find no merit in Appellant's present claim that the detectives' conduct, which violated *Miranda,* tainted and invalidated his subsequent waiver of rights and statement.

\* \* \*

The fact that a suspect has made an unwarned admission does not warrant

a presumption of compulsion. A subsequent administration of *Miranda* warnings should ordinarily suffice to remove the conditions that precluded admission of the earlier statement.

*Id.* at [435–36, 787 A.2d at] 405–06. Thus, even if the pre-*Miranda* statements made by [Appellant] were the product of a custodial interrogation, they are nonetheless admissible due to the absence of coercion.

(Omnibus Pre-trial Motion Opinion at 6–14) (some internal citations and quotation marks omitted). We accept the trial court's analysis and see no reason to disturb its decision. Appellant voluntarily: (1) remained at her parents' home; (2) went to the police station to speak with police officers; (3) confessed her relationship with Mr. Fransen and her involvement in Mr. Sandt's murder; (4) waived her constitutional right to remain silent and right to an attorney; (5) provided a written statement to police; and (6) supplied an audiotape statement to police. At all times prior to her *Miranda* warnings, Appellant enjoyed freedom of action and was not placed in a situation in which she reasonably could have believed that her freedom of action or movement was restricted by police interrogation. *See Williams, supra.* Moreover, even if Appellant was subject to a *Miranda* violation, she was not inevitably disabled from waiving her rights and confessing after she received the requisite warnings. Therefore, we conclude Appellant's confession was properly admitted at trial.

¶ 52 In her third issue, Appellant argues the nude and semi-nude photographs (of Appellant and Mr. Fransen) were irrelevant in this case. Appellant insists the Commonwealth used the photographs just to inflame the jury's passions. Appellant claims the trial court did not engage in any legal analysis to determine whether the photographs were properly admissible. Instead, Appellant suggests the trial court simply admitted the photographs because it "didn't like [Appellant]." (Appellant's Brief at 40). Appellant concludes the court erred in admitting the photographs, and she is therefore entitled to a new trial.

¶ 53 In response, the Commonwealth claims the photographs depicting Appellant and Mr. Fransen in various states of undress were properly admitted, because they constituted evidence of Appellant's guilty mind. Specifically, Appellant discarded these photographs, along with the couple's love letters, on her way home to the crime scene, after receiving a call from her mother. The Commonwealth asserts Appellant's disposal of these items was evidence of her guilty mind and constituted an effort to cover-up any connection between Appellant and Mr. Fransen. The Commonwealth concludes the trial court properly admitted the photographs into evidence at trial.

¶ 54 Rule 402 of the Pennsylvania Rules of Evidence states: "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Nevertheless, Rule 403 provides:

**Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time**

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Pa.R.E. 403. In this balancing test for admissibility the question is whether the challenged evidence is so unfairly prejudicial that its inflammatory nature substantially outweighs its probative value. *Com-*

*monwealth v. Peer*, 454 Pa.Super. 109, 684 A.2d 1077 (1996).

¶ 55 We employ a two-part test to determine if allegedly inflammatory photographic evidence is admissible. *Commonwealth v. Hetzel*, 822 A.2d 747, 765 (Pa.Super.2003), *appeal denied*, 576 Pa. 711, 839 A.2d 351 (2003). First, assuming the photographs are relevant, the court must decide if the photographs are inflammatory. *Id.* If the photographs are not inflammatory, they are admissible. *Id.* On the other hand, if the photographs are inflammatory, the court must balance the evidentiary need for the photographs against the likelihood they will inflame the minds and passions of the jurors. *Id.* Admission of photographic evidence is proper "where the evidentiary value exceeds the inflammatory danger." *Id.*

¶ 56 As a prefatory concern, we observe that Pennsylvania Rule of Appellate Procedure 2119 provides, in pertinent part:

**Rule 2119. Argument**

(a) **General rule.** The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

Pa.R.A.P. 2119. Further:

Rule 2119 contains mandatory provisions regarding the contents of briefs. We have held consistently, "arguments that are not **appropriately** developed are waived."

It is the appellant who has the burden of establishing [her] entitlement to relief by showing that the ruling of the trial court is erroneous under the evidence or the law.

*Jones v. Jones*, 878 A.2d 86, 91 (Pa.Super.2005). *See also Commonwealth v. Franklin*, 823 A.2d 906, 910 (Pa.Super.2003).[8]

¶ 57 Instantly, Appellant's third issue rests solely on the trial court's alleged personal animus toward her. Appellant does not argue why the photographs are irrelevant or inflammatory. *See Hetzel, supra.* Additionally, Appellant does not substantiate her assertion with evidence that the trial court based its decision to admit the photographs on its alleged animosity towards Appellant. *See* Pa.R.E. 2119(a); *Hetzel, supra.* Appellant has not presented a pertinent discussion of her third issue or satisfied her burden to establish her entitlement to relief by showing that the ruling of the trial court was erroneous under the evidence of the case or prevailing law. Further, the record does not support Appellant's conclusory characterization of the court's personal animus toward her. Without more, Appellant's issue does not constitute a valid issue on appeal that warrants full review. *See Commonwealth v. Miller*, 721 A.2d 1121, 1124 (Pa.Super.1998) (refusing to consider merits of issues not properly raised and developed in briefs). Therefore, we decline to give this issue any further attention. *See* Pa.R.A.P. 2119(a), *supra; Miller, supra.*

¶ 58 Based upon the foregoing, we hold: (1) the trial court erred when it admitted the victim's letter at trial, because the letter constitutes hearsay and does not

---

**8.** The Rules of Appellate Procedure apply to criminal and civil cases alike. *See Lineberger v. Wyeth*, 894 A.2d 141, 148 n. 4 (Pa.Super.2006) (citing *Kanter v. Epstein*, 866 A.2d 394, 400 n. 6 (Pa.Super.2004), *appeal denied*, 584 Pa. 678, 880 A.2d 1239 (2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 1048, 163 L.Ed.2d 858 (2006)).

qualify for admission at trial under a recognized exception to the hearsay rule; nevertheless, this evidentiary ruling was harmless error, where otherwise properly admitted evidence overwhelmingly established Appellant's guilt beyond a reasonable doubt; (2) Appellant's confession was admissible because she was not the subject of a custodial interrogation when she initially confessed; and, after receiving her *Miranda* warnings and waiving her right to remain silent and right to counsel, she freely and willingly repeated her confession to police; (3) Appellant's third issue is waived for failure to develop a cognizable or appropriate legal argument on appeal. Accordingly, we affirm.

¶ 59 Judgment of sentence affirmed.

¶ 60 Judge JOYCE files a Concurring Opinion.

¶ 61 Judge MUSMANNO files a Concurring and Dissenting Opinion, which judge KLEIN joins.

CONCURRING OPINION BY JOYCE, J.:

¶ 1 Upon my review, I agree with the distinguished Majority's thoughtful disposition of each of Appellant's issues, particularly with the conclusion that Appellant's letter was inadmissible under the state of mind exception to the hearsay rule.

¶ 2 Out-of-court statements are admissible under the state of mind exception to the hearsay rule for two primary reasons: (1) the declarant's state of mind is often impossible to prove in the absence of these statements and (2) statements of the declarant's state of mind are viewed to be reliable, as are present sense impressions and excited utterances, due to their spontaneity. *See* Packel & Poulin, Pennsylvania Evidence, § 803(3)–1(a). The state of mind exception to the rule against hearsay permits the introduction of out-of-court statements in three particular instances. First, the exception may be used to establish the declarant's state of mind when the declarant's state of mind is at issue. *Id.* at § 803(3)-(1)(a)(1); *Commonwealth v. Auker,* 545 Pa. 521, 547, 681 A.2d 1305, 1319 (1996); *Commonwealth v. Riggins,* 478 Pa. 222, 234, 386 A.2d 520, 526 (1978). A declarant's state of mind is at issue if it is an element of a charge, claim or defense. Packel & Poulin, at § 803(3)-(1)(a)(1). For example, a murder victim's state of mind might be relevant to rebut a defendant's claim of self-defense, accident or suicide, *see U.S. v. Brown,* 490 F.2d 758, 780 (1973), or to establish, where the crime of burglary or kidnapping is also charged, that the victim would not have given the defendant permission to enter or would not have gone with the defendant willingly. *See Commonwealth v. Stallworth,* 566 Pa. 349, 363, 781 A.2d 110, 118 (2001); *Auker, supra* at 547, 681 A.2d at 1319; *Riggins, supra* at 234, 386 A.2d at 526. Second, a declarant's out-of-court statement that he intends to perform a particular act in the future may be admissible under this exception to establish that the declarant acted in conformity with his/her expressed intention. Packel & Poulin, at § 803(3)-(1)(a)(2); *Commonwealth v. Sneeringer,* 447 Pa.Super. 241, 668 A.2d 1167, 1171–72 (1995) (holding that murder victim's statements to third parties about her intention to end her relationship with the defendant and to throw him out of the house was admissible under the state of mind exception to show that she acted in conformity with her intention; the fact that the victim ended her relationship with the defendant was probative of his motive). Third, an out-of-court statement of a declarant's memory or belief may be admitted to prove a fact remembered or believed only if the statement relates to the execution, revocation, identification or terms of the declarant's will. Packel & Poulin, at

§ 803(3)–1(a)(3); *see generally Brown,* 490 F.2d at 763 (stating "[i]n general, where state of mind testimony is sought to be used in an attempt to demonstrate the truth of the underlying facts rather than solely to show state of mind, the evidence must be excluded"). If the state of mind exception permitted the introduction of statements indicating a belief in, or memory of a fact, the state of mind exception would swallow the rule against hearsay. Packel & Poulin, at § 803(3)-(1)(a)(3), citing *Shepard v. U.S.,* 290 U.S. 96, 105–106, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

¶ 3 In the instant case, the victim's letter refers entirely to his memory of past events (*i.e.* his discovery of two love letters addressed to his wife, his discussion with her about the first letter, his recollection of the letters' contents, his wife's overnight with her mother, his visit with Lenny, his memory of the substance of his discussion with Lenny, his recollection that Lenny wore rubber gloves during his visit, his discussion with his wife after Lenny's visit, his discovery of his missing pistol, and his discussion with his wife regarding the pistol) and to his belief about what these events could mean (*i.e.* Lenny tried to avoid leaving fingerprints and Appellant gave Lenny the gun to murder him). Further, the trial court permitted the Commonwealth to introduce this letter, in its entirety, to circumstantially prove that Lenny and Appellant had a relationship and a motive to kill the victim. Since the letter could only establish the existence of a relationship and a motive if the jury believed the truth of the matter contained therein, the letter constitutes hearsay. Furthermore, the declarations contained in the letter do not qualify under the state of mind exception to the hearsay rule because (1) the victim's state of mind is not at issue in this prosecution; (2) the only statement of intention in the letter—that the victim would place the love letters with the letter

he authored—has no probative value if offered solely to prove that he did just that, and (3) the statements of memory or belief contained in the letter cannot be offered to prove the truth of the matter asserted, namely, that Appellant and Lenny had a relationship and a motive to kill the victim.

¶ 4 Beyond this, I cannot conclude that the declarations contained in the victim's letter could be classified as spontaneous, thereby engendering them with a degree of reliability and trustworthiness. The record reflects that Appellant drafted a lengthy handwritten letter, spanning multiple pages and containing sixty sentences, in which he recounted the relevant events occurring over the course of, at least, twenty-two days. After digesting and synthesizing these events, the victim concluded that his wife and her lover may be plotting his demise. These facts, coupled with the narrative quality of a letter, indicate that the letter was not spontaneous. Rather, it emanated from his reflective faculties.

¶ 5 I write separately, however, to ask the Supreme Court to clarify the existing decisional law on the applicability of the state of mind exception to the hearsay rule, should the opportunity present itself. Although the Majority attempts to distinguish a number of these cases, I am unable to do so. On a number of occasions, our Supreme Court has held that a murder victim's statements, regarding his/her relationship with the appellant, were admissible under the state of mind exception to the rule against hearsay to show the presence of ill-will, malice or motive for the killing. *See e.g. Stallworth, supra* (finding that the appellant's threats to the murder victim, which were contained in a PFA petition, were admissible under the state of mind exception to the hearsay rule to establish the appellant's intent or mo-

tive for committing the crime); *Commonwealth v. Chandler*, 554 Pa. 401, 721 A.2d 1040 (1998) (finding that the trial court properly permitted the Commonwealth to introduce evidence that the murder victim had told a third party about her negative feelings for the appellant and her relationship with him under the state of mind exception because the victim's opinion of the appellant and her marriage to him went to the presence of ill-will, malice or motive for the killing); *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261 (2000) (finding that the murder victim's statement to a third party that the victim had smoked the appellant's crack cocaine was admissible under the state of mind exception to the hearsay rule to show the presence of ill-will, malice, or motive for the killing). Conversely, on other occasions, our Supreme Court has held that the murder victim's statements regarding his/her relationship with the appellant are not admissible because the victim's perception of the state of the relationship is not relevant. *See Commonwealth v. Laich*, 566 Pa. 19, 777 A.2d 1057 (2001) (finding that the appellant's threats to kill the murder victim if he ever caught her with another man were not admissible under the state of mind exception because the victim's state of mind was irrelevant as to the appellant's degree of guilt); *Commonwealth v. Thornton*, 494 Pa. 260, 431 A.2d 248 (1981) (finding that the trial court improperly admitted the murder victim's statement to police—that the appellant was after him—because the murder victim's state of mind was not at issue in the case). I respectfully opine that the Supreme Court's clarification of this precedent would aid the bench and bar of this Commonwealth.

¶ 6 Having concluded that the trial court improperly admitted the letter, but that the error was harmless beyond a rea-

sonable doubt, I concur in the esteemed Majority's disposition.

### CONCURRING AND DISSENTING OPINION BY MUSMANNO, J.:

¶ 1 The majority presents an excellent, well-reasoned and cogent analysis of the rule against hearsay, as applied to the letter written by the decedent, Mr. Sandt. I wholeheartedly agree with my esteemed colleague that Mr. Sandt's letter constituted inadmissible hearsay and no exception applied. However, I am constrained to conclude that the improper admission of the letter at trial was not harmless error, beyond a reasonable doubt.

¶ 2 An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 528 (2005). "If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless." *Id.; see Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155, 164–66 (1978) (stating that the factors to be considered in weighing harmlessness of error include (1) whether error was prejudicial, and if so, whether it was *de minimus;* (2) whether erroneously admitted evidence was merely cumulative of other untainted evidence that was substantially similar to erroneously admitted evidence; and (3) whether evidence of guilt was so overwhelming, as established by properly admitted and uncontradicted evidence, that prejudicial effect of error was insignificant).

¶ 3 At trial, the Commonwealth presented strong evidence of Appellant's involvement in Mr. Sandt's death. However, the prejudicial impact of Mr. Sandt's letter was, in my view, insurmountable. The letter was so damning that there clearly is a reasonable possibility that its improper

admission contributed to the verdict. On this basis, I would conclude that the error was not harmless, and accordingly, I would reverse the judgment of sentence and remand for a new trial.