J-A29019-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| IJAZ KHOKHAR | |
| Appellant | No. 112 WDA 2016 |

Appeal from the Judgment of Sentence December 21, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0005915-2015

BEFORE:  DUBOW, J., MOULTON, J., and MUSMANNO, J.

MEMORANDUM BY MOULTON, J.:                    **FILED APRIL 7, 2017**

Ijaz Khokhar appeals from the December 21, 2015 judgment of sentence entered in the Allegheny County Court of Common Pleas following his convictions for involuntary deviate sexual intercourse ("IDSI") – forcible compulsion, and sexual assault.[1]  We affirm.

The trial court summarized the factual history of this matter as follows:

> At the time of trial [Victim] was a twenty-year old nursing student at Duquesne University.  In the late hours of March 21, 2015 and the early morning hours of March 22, 2015, [Victim] was drinking with her friends in Pittsburgh's South Side at an establishment named Charlie Murdoch's.  [Victim] testified that she and her friends took a shuttle bus from campus to the South Side where she used a fake ID to obtain alcohol.  [Victim] testified that

---

[1] 18 Pa.C.S. §§ 3123(a)(1) and 3124.1, respectively.

when she left her seat to use the restroom she left her cellphone on a bar stool and that she ultimately left without her phone at 1:30 a.m. [Victim] stated that she left to go to a friend's house when she realized (to her dismay) that she had left her phone behind. Left without a way to contact her friends [Victim] returned to Charlie Murdoch's at about 2:30 a.m. in an attempt to find her phone, but was denied entry. Upset, intoxicated, and crying – [Victim] began walking back towards Duquesne when she was approached by two individuals from the Hookah Lounge who comforted her and invited her inside. [Victim] testified that a man offered to give her a ride back to her dorm and she identified [Khokhar] as that individual. [Victim] accompanied [Khokhar] to his vehicle which she identified as an "old, red, four-door Honda." [Victim] identified on a map routes and locations of the incident.

Shortly after leaving the Hookah Lounge, [Khokhar] locked the doors of the vehicle and sped up. [Khokhar] unbuckled his pants, exposed his penis, and told [Victim] "you are going to have to do something for me." [Khokhar] had [Victim] give directions back to her dorm as she performed oral sex on him. Upon arriving at the dormitory [Khokhar] unlocked the door and [Victim] got out, and by the time she had turned around he had driven away. [Victim] stated that she was scared and thought "what would happen if I said no because he was driving away from where I lived, so I was scared." Victim explained that she accepted the ride because she was scared to walk back to campus as she would have had to go through a tunnel where "homeless people" sleep. She was unable to get a ride without her cell phone. [Victim] ultimately reported the crime eighteen days later. [Victim] stated that she reported on that occasion when, after jogging with a friend, she saw [Khokhar] opening the Hookah Lounge[, and] saw it as a "sign" that she should do something.

The jury heard testimony from Nicholas Kiener a friend and fellow student of [Victim]. Mr. Kiener testified that on the night of the crime [Victim] visited the dorm room of himself and his roommate Scott Zuefle. She revealed to them that she had been "sexually harassed by a male" and had been forced into performing "oral sex." He and his

roommate Mr. Zuefle attempted to calm [Victim], and encouraged her to report the crime to the police. Mr. Zuefle also testified to the veracity of the encounter between his roommate and [Victim].

Officer Georgette Scafede, a thirty-five-year veteran of the City of Pittsburgh Police Force was the desk officer who took down [Victim's] initial complaint. Officer Scafede testified that [Victim] was crying and shaking and had to stop the interview several times. Detective [Jeffery] Abraham of the Sex Assault Crime and Crisis Office for the City of Pittsburgh Bureau of Police was then assigned to the case. Detective Abraham stated that [his partner] Detective Brust (who did not have any knowledge of the case) presented the victim with a photo array containing Mr. Khokhar's photo. [Victim] identified Mr. Khokhar in the array as the man who assaulted her. On April 21, 2015 Detective Abraham interviewed [Khokhar] at his South Side Hookah Lounge. After informing [Khokhar] of his rights concerning the interview Mr. Khokhar waived his rights and agreed to speak with Detective Abraham. When asked about the allegations he stated he did not remember [Victim] and that he never received oral sex from anyone but his girlfriend. Mr. Khokhar told Detective Abraham that sometimes "females are jealous of his lounge and try to catch him the wrong way."

After further questioning Mr. Khokhar admitted that he did remember [Victim] and she had indeed given him oral sex in his vehicle. Mr. Khokhar stated that [Victim] gave him oral sex out of gratitude for the ride. Mr. Khokhar told Detective Abraham he believed [Victim] was upset that evening about her boyfriend. Detective Abraham testified that after his interview with Mr. Khokhar, he asked [Victim] to identify for him the route taken by herself and Mr. Khokhar the evening of the assault. Detective Abraham drew the route he took with [Victim] on a map for the jury. [Khokhar's] younger brother, Noel Khokhar, testified he was the DJ at the Hookah Lounge on the evening of the assault. Noel Khokhar testified that [Khokhar] was in the next room kissing "the young lady" and that the situation seemed consensual. Noel did not recall seeing [Khokhar] leave with [Victim] that evening. When questioned by the prosecution as to what the "young lady" looked like the only descriptor Noel could offer was that she was "white."

He could not recall what she was wearing, if anyone else was in the room with them, or why he walked into the side room where he saw his brother and the "young lady." Noel testified that he helps his brother at the Hookah Lounge but does not receive any compensation for his work and that he and [Khokhar] live together. When asked why he had not stepped forward[, and] informed anyone he saw his brother kissing [Victim], his response was "I never thought of [it]."

[Khokhar] testified that he opened his Hookah Lounge in December of 2014. He further testified that he had a video surveillance system in place in March of 2015 but the footage gets overwritten every two weeks. Mr. Khokhar claimed that [Victim] was walking down the street very upset and he invited her inside and gave her a bottle of water. Mr. Khokhar testified that [Victim] was clearly intoxicated, as she smelled of alcohol. Mr. Khokhar claimed that [Victim] claimed she was upset over the loss of her cellphone and "something" with her boyfriend, that she then cheered up and they began "making out." T.T. p.p. 226. Mr. Khokhar then testified he informed his brother that he was going to give [Victim] a ride and would return. Mr. Khokhar denied that he ever locked the doors of his vehicle while [Victim] was in the car. He then drew the route he used to take [Victim] home from the Hookah Lounge. Mr. Khokhar then testified that "on 10th Street, before Muriel Street and 10th Street, I took my penis out, whichever, and we was talking and was kissing and she started playing with it and she started giving oral sex."

Mr. Khokhar stated than when Detective Abraham interviewed him, the night of the assault was, "blurry, like I didn't know like what happened that day clearly." Mr. Khokhar stated that only after a month in jail did he remember that he "made out" with [Victim] that evening – a fact he did not "remember" at the time of his interview with Detective Abraham. [Khokhar] testified that [Victim] was so intoxicated that she had trouble walking straight. He testified that the victim was the one that grabbing him and making out with him. On rebuttal, [Victim] testified that she was not so intoxicated she could not walk, that she did not "make out" with [Khokhar], and she did not voluntarily give him oral sex.

- 4 -

Opinion, 5/23/16, at 2-8 ("1925(a) Op.") (internal citations omitted).

On September 24, 2015, following a jury trial, Khokhar was convicted of one count of IDSI and one count of sexual assault. On December 21, 2015, the trial court sentenced Khokhar to 4 to 8 years' incarceration, followed by 5 years' probation.

On December 23, 2015, Khokhar filed a post-sentence motion for reconsideration of the trial court's denial of his request for bail pending appeal, which the trial court denied the same day. On January 20, 2016, Khokhar filed a timely notice of appeal.

Khokhar raises the following issues on appeal:

> I. WHETHER THE COMMONWEALTH PROVIDED EVIDENCE SUFFICIENT TO CONVICT APPELLANT OF VIOLATING 18 Pa.C.S. § 3123(a)(1) INVOLUNTARY DEVIATE SEXUAL INTERCOURSE – FORCIBLE COMPULSION?
>
> II. WHETHER THE COMMONWEALTH PROVIDED EVIDENCE SUFFICIENT TO CONVICT APPELLANT OF VIOLATING 18 Pa.C.S. § 3124.1 SEXUAL ASSAULT?
>
> III. WHETHER TRIAL COURT ERRED IN PERMITTING WITNESS DETECTIVE JEFFERY ABRAHAM TO PRESENT HEARSAY EVIDENCE AND PROVIDE LOCATIONS DERIVED FROM SUCH HEARSAY ON A MAP?

Khokhar's Br. at 5.

We apply the following standard when reviewing a sufficiency of the evidence claim: "[W]hether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." ***Commonwealth v. Lehman***, 820 A.2d 766, 772

- 5 -

(Pa.Super. 2003) (quoting **Commonwealth v. DiStefano**, 782 A.2d 574, 582 (Pa.Super. 2001)). In applying this standard, "we may not weigh the evidence and substitute our judgment for the fact-finder." **Id.** Further, "the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." **Id.** Moreover, "[a]ny doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." **Id.** In applying the above test, we must evaluate the entire record. **Id.** Further, "the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." **Id.**

First, we address Khokhar's challenge to the sufficiency of the evidence to support his conviction for IDSI – forcible compulsion.[2] Khokhar contends that his statements to Victim did not demonstrate "forcible compulsion" but rather "amounted to nothing more than a solicitation for oral sex." Khokhar's Br. at 19.

---

[2] As a threshold matter, we note that Khokhar, in part, discusses 18 Pa.C.S. § 3123(a)(2), which prohibits IDSI "by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." Because Khokhar was charged and convicted of IDSI pursuant to 18 Pa.C.S. § 3123(a)(1), which is IDSI "by forcible compulsion," we will not address his section 3121(a)(2) argument.

A person commits IDSI "'when he or she engages in deviate sexual intercourse with a complainant by . . . forcible compulsion.'" *Commonwealth v. Wilson*, 825 A.2d 710, 714 (Pa.Super. 2003) (quoting 18 Pa.C.S. § 3123(a)(1)). Deviate sexual intercourse is "sexual intercourse per os or per anus between human beings." *Id.* (quoting 18 Pa.C.S. § 3101). "Forcible compulsion" is "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." 18 Pa.C.S. § 3101.

> [T]he "force necessary to support convictions for rape and involuntary deviate sexual intercourse need only be such as to establish lack of consent and to induce the woman to submit without additional resistance . . . The degree of force required to constitute rape [or involuntary deviate sexual intercourse] is relative and depends upon the facts and particular circumstance of the case."

*Commonwealth v. Rhodes*, 510 A.2d 1217, 1226 (Pa. 1986) (quoting *Commonwealth v. Williams*, 439 A.2d 765, 768 (Pa.Super. 1982)).

> When forcible compulsion (used or threatened) consists of moral, phychological [sic] or intellectual force, the force may be less tangible but is not less susceptible of proof, and the critical circumstances and evidence here will be those which tend to prove or disprove compulsion or lack of consent, *i.e.* that such force was used to compel a person to engage in sexual intercourse against that person's will.[14]

> [14] It is not necessary to prove that the victim actually resisted in order to prove that the act of sexual intercourse was against the victim's will and/or without consent. Section 3107 provides that the "victim need not resist the actor in prosecutions under" chapter 31 and makes it clear that lack of consent is not synonymous with lack of resistance. 18 Pa.C.S.A. § 3107.

- 7 -

*Id.* at 1226-27 (internal quotation marks omitted).

At trial, Victim testified that when Khokhar made a right turn instead of a left turn to return to Duquesne University, she was scared. N.T., 9/24/15, at 55-56. Similarly, when Khokhar locked the doors of the car, Victim "felt so helpless and scared." *Id.* During the drive, Khokhar started unbuckling his pants, which again made Victim feel "scared and helpless." *Id.* at 56-57. Khokhar also told Victim, "[Y]ou're going to have to do something for me" and later, while touching himself and motioning to Victim to give him oral sex, said, "[Y]ou better get at it." *Id.* at 57-58. Victim testified that she was not flirting with Khokhar and had not discussed anything sexual with him. *Id.* at 60-61. In addition, Victim testified as follows:

> Q. So at any point during your ride back to Duquesne with this individual, did you want to give him oral sex?
>
> A. No.
>
> Q. Did he ask you if it was okay for you to give him oral sex?
>
> A. No.
>
> Q. And when he said these things to you, you better – what exactly did he say?
>
> A. He said, you better go do something for me.
>
> Q. Did he say anything after that?
>
> A. No.
>
> Q. And when he said these things to you, did you think that you had any way to say no?

A. No. I was terrified because the thought that came in my mind was, what would happen if I said no because he was driving away from where I lived, so I was scared.

*Id.* at 63.

Accordingly, we conclude that the evidence presented at trial was sufficient to sustain Khokhar's conviction for IDSI, such that Victim was compelled to engage in sexual intercourse against her will through forcible compulsion.[3] That Victim allegedly "did not make an affirmative statement that she had no interest in [Khokhar's] sexual advances," Khokhar's Br. at 18, is irrelevant.

Next, we address Khokhar's challenge to the sufficiency of the evidence to support his sexual assault conviction. "A person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent." 18 Pa.C.S. § 3124.1. "Resistance to sexual assault is not required

---

[3] Despite the language of section 3101 that includes intellectual, moral, and emotional force within the definition of forcible compulsion, Khokhar suggests that forcible compulsion may only be met by physical and/or psychological force. *See* Khokhar's Br. at 16-18. Khokhar relies on *Commonwealth v. Berkowitz*, 641 A.2d 1161, 1164 (Pa. 1994), for the proposition that "where there is a lack of consent, but no showing of either physical force, a threat of physical force, or psychological coercion, the 'forcible compulsion requirement'" is not met. The obvious flaw in this argument is that "[l]ess than one year after the *Berkowitz* decision, the legislature amended the sexual assault law by adding a definition for forcible compulsion." *See Commonwealth v. Fischer*, 721 A.2d 1111, 1116 (Pa.Super. 1998) (noting that the legislature thus added a "broader definition" of forcible compulsion than set out in *Berkowitz*). Accordingly, in the instant matter, *Berkowitz* does not control.

to sustain a conviction." ***Commonwealth v. Smith***, 863 A.2d 1172, 1176 (Pa.Super. 2004). "[I]t is for the fact finder to make credibility determinations, and the finder of fact may believe all, part, or none of a witness's testimony." ***Commonwealth v. Andrulewicz***, 911 A.2d 162, 166 (Pa.Super. 2006). As this Court has recognized:

> [T]he uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses. If the factfinder reasonably could have determined from the evidence adduced that all of the necessary elements of the crime were established, then that evidence will be deemed sufficient to support the verdict.

***Commonwealth v. Charlton***, 902 A.2d 554, 562 (Pa.Super. 2006) (citations and quotation marks omitted).

As the trial court stated, the jury did not believe Khokhar's version of events. 1925(a) Op. at 10. The jury instead credited Victim's testimony and reasonably could have determined that the Commonwealth established all of the necessary elements of the crime, including that Victim did not consent. Accordingly, the evidence was sufficient to support Khokhar's sexual assault conviction.

Finally, we address Khokhar's contention that the trial court erred in admitting hearsay evidence during the testimony of Detective Abraham. In particular, Detective Abraham described and drew the route taken by Khokhar and Victim the night of the crime, based on information Victim had

provided to him during a ride along.   The trial court overruled Khokhar's hearsay objection.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."   **Commonwealth v. McCrae**, 832 A.2d 1026, 1034 (Pa. 2003); **see** Pa.R.E. 801(c).   Hearsay is not admissible "except as provided by the Pennsylvania Rules of Evidence, [by other rules prescribed by the Supreme Court of Pennsylvania], or by statute."   **McCrae**, 832 A.2d at 1034; **see** Pa.R.E. 802.

After reviewing the trial transcript, we conclude that the trial court erred in admitting Detective Abraham's testimony regarding the route taken by Khokhar and Victim.   In its 1925(a) opinion, the trial court concluded that Detective Abraham's testimony regarding Victim's out-of-court statements was admissible for two reasons:   (1) for the statements' effect on the listener; and (2) as prior consistent statements of Victim.   1925(a). Op. at 10-11.   Neither basis supports the admission of the statements.

When an out-of-court statement is used to show its effect on the listener, and not for the truth of the matter asserted, it is non-hearsay.   **See Schmalz v. Manufacturers & Traders Trust Co.**, 67 A.3d 800, 803 n.3 (Pa.Super. 2013).   Similarly, it is well-established that "certain out-of-court statements offered to explain a course of police conduct are admissible. Such statements do not constitute hearsay since they are not offered for the

truth of the matters asserted; rather, they are offered merely to show the information upon which police acted." ***Commonwealth v. Palsa***, 555 A.2d 808, 810 (Pa. 1989). The admission of prior consistent statements is governed by Pennsylvania Rule of Evidence 613(c),[4] which under certain circumstances allows the admission of prior consistent statements to rehabilitate the witness's credibility.

Based on our review of Detective Abraham's trial testimony, ***see*** N.T., 9/23/15, at 164-66, we conclude that Victim's out-of-court statements were offered for their truth, that is, to prove Khokhar's route that night, rather than for the effect these statements had on Detective Abraham or to properly bolster Victim's credibility. The conduct of Detective Abraham that the statements purportedly affected – his re-tracing of the route described

---

[4] Rule 613(c) reads as follows:

(c) *Witness's Prior Consistent Statement to Rehabilitate*. Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness's credibility if the opposing party is given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of:

(1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or

(2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness's denial or explanation.

by Victim – was only relevant as corroboration of the statements themselves. And the introduction of Victim's out-of-court statements satisfied neither prong of Rule 613(c)'s exception for prior consistent statements. Accordingly, this portion of Detective Abraham's testimony was hearsay and should not have been admitted.

We conclude, however, that the error was harmless. "The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." ***Commonwealth v. Drummond***, 775 A.2d 849, 853 (Pa.Super. 2001).

> The Commonwealth bears the burden of establishing the harmlessness of the error. This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Levanduski***, 907 A.2d 3, 21 (Pa.Super. 2006). We conclude that the trial court's error did not so "confuse the jury" as Khokhar argues, Khokhar's Br. at 21, as to prejudice Khokhar; and even if it did, any such prejudice was *de minimis*.

Khokhar argues that the route described by Detective Abraham was "inaccurate, and demonstrated a route significantly more off course that [sic] the Complainant's expected route of travel." Khokhar's Br. at 21.

Khokhar further argues that Detective Abraham's testimony "was used in effort [sic] to characterize Appellant as having no intention to drive towards Duquesne University that evening." *Id.* These arguments do not merit relief. The relevance of the route taken by Khokhar was its impact on Victim's perception of the danger posed by Khokhar. Victim testified that Khokhar made a right turn instead of a left turn when he pulled out of the parking lot and locked the car doors, which made her feel helpless and scared. She also testified that Khokhar drove very fast, went the wrong way down a one-way street at one point, and did not stop at stop signs. While Khokhar strongly contested certain aspects of Victim's testimony concerning his driving, N.T., 9/24/15, at 234, 255, 256 (testifying that he did not lock the doors, did not speed, did not go the wrong way down a one-way street, and did not ignore stop signs), he himself admitted turning right rather than left out of the parking lot, *id.* at 234-35. Khokhar's claim on appeal that Detective Abraham's testimony about the route was central to the Commonwealth's case is belied by the fact that neither party referenced that testimony in closing arguments. The prejudicial effect, if any, of the admission of Detective Abraham's hearsay testimony was insignificant.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/7/2017