J-A17034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| STEPHEN MOORE | : | |
| | : | |
| Appellant | : | No. 1638 EDA 2022 |

Appeal from the Judgment of Sentence Entered May 19, 2022
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s):  CP-46-CR-0000140-2020

BEFORE:   KING, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KING, J.:                    **FILED NOVEMBER 8, 2023**

Appellant, Stephen Moore, appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas, following his jury trial convictions for first-degree murder and two counts of persons not to possess firearms.[1]  We affirm.

The trial court set forth the relevant facts and procedural history of this case as follows:

> On May 16, 2022, [Appellant's] four-day trial commenced at which the following facts were established.  Sergeant Michael Ponto, a patrol sergeant with the Pottstown Police Department was conducting speed enforcement on Easter Sunday, April 21, 2019.  He was situated at Industrial Highway in Pottstown.  At 12:25 p.m., he [heard] a pop sound in the distance, and about 10 to 15 seconds later, he

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a) and 6105(a)(1).

heard a vehicle racing toward him. Sergeant Ponto pursued the vehicle, traveling eastbound on Industrial Highway at a high rate of speed, and he activated his lights and sirens. From a distance, the sergeant observed the Jeep crash into a tree. He approached the crash scene, and observed [Appellant] jump out of the Jeep. Within seconds after the crash, [Appellant] ran away and eventually ran out of the sergeant's sight. Sergeant Ponto went back to the crash scene and secured the vehicle. There was a male there, later identified as Eugene Cabot, who had found a Taurus 9mm firearm and two cell phones on the floorboard of the vehicle. Mr. Cabot had observed the Jeep go speeding and go airborne before crashing into the tree. He got out of his own vehicle to check on the crashed Jeep, and found the firearm and cell phones. The sergeant retrieved the items, and noted that the Taurus firearm was loaded with a round in the chamber. A K9 officer also responded to the scene, but he was unable to detect [Appellant's] whereabouts.

Ian Hood, M.D., an expert in the field of forensic pathology performed an autopsy on [the victim, Joshua Smith, Appellant's good friend.] The victim presented as a 25-year-old male, 5'11", and 230 pounds. The doctor determined that the victim died as a result of gunshot wounds to the head and neck. The most obvious injury was a gunshot wound to the neck, and the doctor opined that there would have been a lot of blood loss from this injury. Dr. Hood also testified that there was an unusual gunshot wound to the back of the victim's head. There was soot and gunpowder on the hoodie that the victim had been wearing, indicating that the gun was only a few inches away when it was fired. Dr. Hood opined that this execution shot to the back of someone's head would normally cause a victim to drop and die, but in this case, the victim had an unusually thick skull that the bullet actually bounced off his skull and came back out. Putting this physical evidence together, Dr. Hood believed that the bullet to the victim's head was probably the first wound, and then the victim was shot in the neck, he ran 200 feet, pumping blood out of his severed arteries, until he went down where he was found.

Cynthia Rodriguez lived at 26 North Charlotte Street, Pottstown with the victim and her three kids at the time of the murder. In the morning on April 21, 2019, at about nine

or ten, Ms. Rodriguez argued with the victim about his drug use. When the victim got "a little aggressive," Ms. Rodriguez went to her next-door neighbor's, Melissa Amey, house. At some point, Ms. Rodriguez testified that she saw "Pete" pull up outside the apartment. Ms. Rodriguez identified "Pete" as [Appellant], and she stated that [Appellant] and the victim were good friends. The victim left with [Appellant]. The victim was wearing dark jeans and a light blue hoodie at that time. [Appellant] and the victim returned about 20, 30 minutes later. The victim changed clothes into a black hoodie, black sweatpants, and black shoes. He and [Appellant] left again in [Appellant's] Jeep. Shortly thereafter, the victim sent a text to Ms. Amey, stating "I am sorry you had to come to this and I'm pretty sure you will never see me again. Love ya." The neighbor responded, "Okay Josh. I think you need to calm down. Don't do anything dumb." The victim replied, "Sorry." Ms. Rodriguez found out that something happened to the victim when police arrived at her apartment, around one or two o'clock.

Next to testify was Diane Barto, who was driving her car on Industrial Highway on April 21, 2019, in the early afternoon. She passed by Roller Mills on Industrial Highway. Roller Mills had rental trucks such as U-Hauls and she saw a car there. She heard one pop sound, and about four seconds later, she observed a man run out a few car lengths in front of her car, run around, and collapse in the middle of the road. The man was bleeding. Ms. Barto called 9-1-1.

Detective Edward Schikel, a detective with the Montgomery County Detective Bureau-Forensic Services Unit, was called to assist in the investigation to obtain forensic evidence. He responded to the crash scene, and secured the area. Inside the Jeep he located a black and silver revolver in the console area. The revolver was loaded with one live round and the four other rounds that look to have been fired. He also found a green case with an extended handgun magazine containing 31 live rounds inside the driver's side of the car. There was a Home Depot receipt dated 4/21/19, which reflected a purchase of a slotted screwdriver. Later a search warrant was obtained. Additional evidence was uncovered including three masks, one full-face cloth mask underneath the driver's seat, a full-faced knit mask on the passenger

floor side, and a mask within the center console of the vehicle.

After processing the crash scene, Detective Schikel went to the location of Roller Mills at 625 Industrial Avenue. He found evidence of a bullet strike on a U-Haul van that was in the parking lot. There was black hair and fiber surrounding the bullet strike. The back of the van was significantly stained with blood, with blood on the left side taillight extending to both doors, traveling left to right. There was blood and a screwdriver on the ground and blood on the roadway. The blood trail extended about 205 feet.

Brittni Andaloro, was accepted as a forensic DNA [analyst]. She received a reference sample for the victim and from [Appellant], and she extracted a DNA profile from each. She analyzed 13 samples. In relevant part, as to the swabs from the Ruger revolver, it contained a DNA mixture that was too complex for her lab because it was at least a four person mixture, and it was forwarded to another lab for additional testing.

A DNA analyst at Cybergenetics, Jennifer Bracamontes, was accepted as an expert in DNA evidence interpretation. The statistical association between the swabs from the revolver and [Appellant's] reference sample was that a match between [Appellant] and the revolver DNA swabs was 373 trillion times more probable than a coincidental match to an unrelated African American person; 98.4 quadrillion times more probable than a coincidental match to an unrelated Caucasian person; and 131 quadrillion times more probable than a coincidence match to an unrelated Hispanic person. The victim's DNA was a match to the revolver that was 53.6 billion times more probable than a coincidence.

Detective Lieutenant William Mitchell, a lieutenant currently in charge of the Major Crimes Unit of the Montgomery County Detective Bureau, was a detective in the Homicide Unit at the time of this murder investigation. He was provided four cell phones to download; one from the victim, two from [Appellant], and one from Ms. Amey. At trial Detective Mitchell testified as to the activity between [Appellant's] two cell phones to the victim's cell phone between the time of 11:17 a.m. and 12:01 p.m.

Specifically, starting at 11:17 a.m. on April 21st, the victim made an outgoing FaceTime call to [Appellant's] 484 number. A few minutes later the victim received an incoming message from [Appellant's] 484 number. At 11:41, there was activity on [Appellant's] second phone, the 856 number, where there was an outgoing call made to the victim, but there was no duration to that call. At 11:41, the victim made an outgoing FaceTime call to [Appellant's] phone. A few second later, the victim made an outgoing FaceTime call again to [Appellant's] 856 phone number. A few seconds after, the victim received an incoming message from [Appellant's] 856 number. A few seconds after, [Appellant made] an outgoing FaceTime call to the victim. Seconds later, [Appellant] made an outgoing regular phone call to the victim that lasted 26 seconds. A minute later, [Appellant] made another outgoing call to the victim from his 856 number, which lasted 10 seconds. Looking at Ms. Amey's phone, there were several incoming messages from the victim at 11:43. [Appellant] received an incoming message on his 484 number at 11:54 and another incoming message to his 856 number at 11:59 a.m., both from unknown numbers. The last communication between the victim and [Appellant] was at 12:01 p.m., where the victim's phone made an outgoing FaceTime call to [Appellant's] 484 number. The lieutenant testified that between the victim's text message to Ms. Amey's phone at 11:43 a.m. and his contact [with Appellant], there was no other activity from the victim's phone. The lieutenant noted that the Jeep crashed around 12:26 p.m.

Detective Eric Nelson of the Montgomery County Detective Bureau—Forensic Services Unit was accepted as an expert in firearm and toolmark identification. Significantly, Detective Nelson testified that the bullet specimen recovered from the U-Haul at the crime scene was consistent with the Ruger revolver based on caliber and rifling dimensions. However, due to damage to the projectile he could not definitively state it was fired from that firearm. Detective Nelson also compared the bullet specimen taken from the victim at the autopsy and compared it to a test fired bullet specimen from the revolver and was able to determine with certainty that the bullet found inside of the victim was fired by the Ruger revolver.

- 5 -

Sharde Moore, [Appellant's] wife testified that in April of 2019, they were living on Chestnut Street, Pottstown with her children. The morning of the murder, Ms. Moore was with [Appellant] at home, and he told her he was leaving the house to get French toast. He left in her grey Jeep. He did not come back after that. At some point, Ms. Moore tracked his phone, and she tracked it to the police station. At the police station, she was told that there was a car accident and she went to the scene where she saw her Jeep on a tree.

Ms. Moore testified that she did not see [Appellant] until sometime after June 8, 2019, but did not remember exactly when. At that time, they met up in a New Jersey parking lot, where he met his newborn daughter for the first time. According to Ms. Moore, her husband moved back to Pottstown in July of 2019. In the interim, Detective McGowen was in touch with her and she appeared in front of the grand jury, and provided testimony as to whether she had seen [Appellant]. At that time, she knew her husband was wanted for murder.

Former Lieutenant James McGowen of the Montgomery County Detective Bureau testified that an arrest warrant was issued for [Appellant] on April 24, 2019. Attempts were made in order to apprehend him, namely, the information was disseminated to regional law enforcement sharing agencies, [Detective McGowen] disseminated a Wanted poster throughout Pottstown and Reading, and he contacted Ms. Moore. Surveillance was conducted in Pottstown, at the hospital where Ms. Moore was about to give birth to her and [Appellant's] child, and in the area of Ms. Moore's mother's house. Police were in constant contact with Ms. Moore. Grand jury subpoenas were issued in order to elicit information as to [Appellant's] location. These efforts were continuous until [Appellant] was finally apprehended on December 3, 2019 outside his then residence[.] After his arrest, [Appellant] said to Lieutenant McGowen, "So you're McGow[e]n. Every time Sharde got mad she threatened to call you."

Valerie Thinna was a resident of 859 North Charlotte Street, Pottstown at the time of April of 2019. Although she [could not] recall the specific date, she stated that [Appellant] lived

- 6 -

with her in 2019 while Ms. Moore was pregnant. Ms. Moore would visit her husband at [Ms. Thinna's] house. Ms. Thinna testified that [Appellant] always wore a wig when he went out of the house, but not inside the house. At some point she became aware that [Appellant] was wanted by the police, and [Appellant] was present during discussion about it that she had with others. There was a stipulation that when Ms. Thinna was interviewed by police in November of 2021, she admitted that she did know [Appellant] was wanted prior to his arrest and that she learned that information from Ms. Moore.

Officer Michael Glauner, a detective for the Pottstown Police Department, assisted with the execution of a search warrant for 859 North Charlotte Street. In the room that [Appellant] was staying he located a loaded firearm on his bed underneath the pillow. A wig was also found in a separate bedroom.

At the conclusion of the Commonwealth's evidence, defense counsel made a motion for judgment of acquittal, which was denied.

The defense presented its evidence, and [Appellant] testified in his own defense. He testified that he met the victim when they both worked for JP Mascaro, a trash collection company. He described that they were very good friends and had a lot in common. In fact, [Appellant] stated that the victim was his only friend. In April of 2019, [Appellant] was living in Pottstown on Chestnut Street with his wife, Sharde Moore and her two daughters. His wife was about 8 months pregnant, and he was going to trucking school. [Appellant] earned a certificate of completion and diploma on April 11, 2019, which would allow him to work as a commercial driver. [Appellant] explained that this gave him a feeling that he could now support his family; he felt like he was ready to live his dream.

In the morning of April 21, 2019, he and his wife were watching Game of Thrones. At some point he left home to go to Redner's for something to eat. There he ran into his wife's aunt, Aunt Nette, and gave her a ride home. She lived on King and Charlotte Street, right across the street from the victim. There he saw the victim with his girlfriend

- 7 -

on the corner so he pulled over to say a quick hello. Both the victim and his girlfriend look[ed] angry. [Appellant] went back home, but because he sensed that something was wrong, he gave the victim a call. Around 11:41 there was back and forth phone calls between the both of them. Based on those phone calls, [Appellant] picked the victim up. He had told his wife that he was going out for French toast, so she [would not] be mad. [Appellant] and the victim parked behind [Appellant's] house. [Appellant] admitted that at that point he had a 9mm Taurus firearm in his vehicle, which he regularly kept there. [Appellant] denied that the revolver was in his car when he picked up the victim. He had never seen it before. Based upon their discussions in the car, he and the victim went to Home Depot. According to [Appellant], it was the victim's idea to do so because he needed a screwdriver. [Appellant] described the victim as being high when he picked him up. After leaving Home Depot they got back into [Appellant's] Jeep, and remained there for a while before leaving the parking lot. [Appellant] testified that the victim asked him to take him to Roller Mills. [Appellant] told the jury that the victim told him what he was going to do, and the victim removed the screwdriver from its packaging. The victim got out of the car and shut the door. The victim was behind the van doing something. [Appellant] opened his car door and that was when he heard the first gunshot. He heard a few pops, and saw the victim take off running between the vans. At that point, [Appellant] did not know whether the victim had been hit or not. [Appellant] did see the shooter. In fact, the shooter came up to the side of [Appellant's] Jeep and said, "Pussy, who told you to come here?" and smacked him with the gun. [Appellant] described a tussle with the shooter and how the shooter's firearm fell into his car where it bounced off the dashboard and went into the seat. [Appellant] kicked the shooter and the shooter ran away behind Roller Mills out of his sight. [Appellant] said that he did not see the victim at that point.

[Appellant] could only describe the shooter as wearing a Golden State NBA hoodie jacket and that he was brown-skinned. [Appellant] left the area, racing away in an attempt to find the victim. Once he got down the road, he saw the officer with his lights on trying to pull him over. He did not stop because he had two guns in the car, in plain

view, and he had too much to lose to go to jail. [Appellant] crashed into a tree, got out of the car and ran away. [Appellant] only found out later that day that his friend was shot and killed, and he put it together, that since he had the gun in his car the murder would be pinned on him. He called his wife, who told him that the police were looking for him, but he did not go home. After a few days, he found out that there was a warrant out for his arrest. At the time that the police came to arrest him, he had had a gun in his bed because he was scared. As to the ski masks found in his car, [Appellant] explained that it's a culture thing. That people wear ski masks and that he had several of them because after a while they start smelling. He denied that they were committing criminal acts.

On cross-examination, the prosecutor questioned [Appellant] and in relevant part, [Appellant] testified that when he came back to his house after going to Redner's he changed his clothes into all black. He went to pick up the victim, and the Taurus pistol was already in the car. He admitted that after he spent time with the victim, the victim also changed his clothes into all black. The victim did not have a gun, and didn't bring one into the car. [Appellant] reiterated that he went to Home Depot at the victim's request and that he assisted him with the purchase. Then at the victim's direction they traveled to Roller Mills. The prosecutor questioned [Appellant] about the three ski masks in the Jeep, and [Appellant] acknowledged that one ski mask was on the passenger side floor, one was in the center console, and one [was] on the floor next to [Appellant's] gun and extended magazine. [Appellant] also claimed he did not see the shooter come up behind the victim and shoot him in the head or that the victim got shot in the base of the neck. [Appellant] insisted that he saw no indication that the victim was actually shot when he was running in between the vans, then into the street. [Appellant] denied seeing blood spurting out of the victim's neck. According to [Appellant] the victim seemed totally fine while he was running. [Appellant] reiterated under questioning that he hit the gun out of the shooter's hand and it landed in his car. It bounced off the dashboard onto the passenger seat. The shooter took off running. According to [Appellant] he did not think about trying to shoot at the shooter, although his Taurus pistol was under

his seat. [Appellant] was unable to describe the shooter's voice and he could not estimate his height or build.

The Commonwealth presented rebuttal evidence, and entered a stipulation onto the record, namely that [Appellant] was convicted of robbery in 2005, and served a sentence that ended in 2014.

At the conclusion of all the testimony and [after] the jury was excused, defense counsel made a motion for judgment of acquittal, arguing in essence that based on [Appellant's] testimony that there were two equal[ly] possible, believable stories, [and] that is *prima facie* reasonable doubt. The [c]ourt denied the motion.

(Trial Court Opinion, filed 10/14/22, at 2-15) (record citations omitted). On May 19, 2022, the jury convicted Appellant of first-degree murder and two counts of persons not to possess firearms. That same day, the trial court sentenced Appellant to life imprisonment for first degree murder and imposed concurrent sentences of 7 to 14 years' imprisonment for the first firearms conviction, and 5 to 10 years' imprisonment for the second firearms conviction. Appellant subsequently filed a timely post sentence motion challenging the weight of the evidence, which the trial court denied on June 1, 2022. Appellant filed a timely notice of appeal on June 23, 2022. Thereafter, the court ordered Appellant to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b), and, following the grant of an extension of time, Appellant filed his statement on August 10, 2022.

Appellant raises the following three issues on appeal:

1. Whether the trial court abused its discretion when it ruled Appellant could not testify about statements made to him by the victim that were admissible as exceptions to the rule

against hearsay under Pa.R.E. 803(3) and 804(b)(3)?

2. Whether the trial court abused its discretion when it refused to determine whether Appellant would be prejudiced by the jury's fear that someone affiliated with Appellant was recording them outside of court?

3. Whether the trial court abused its discretion when it denied Appellant's post-sentence motion for a new trial because the verdict was against the weight of the evidence?

(Appellant's Brief at 6).

In his first issue, Appellant argues the trial court abused its discretion when it did not allow Appellant to testify about statements allegedly made by the victim on the morning of the murder. Specifically, Appellant claims the court should have permitted him to testify that: 1) the victim asked Appellant to bring his gun with him when Appellant picked the victim up at his house; 2) the victim found out that his girlfriend had been communicating with a person who had previously shot the victim; and 3) the victim told Appellant that he was going to shoot this person and then turn himself in. (*See id.* at 33). Appellant insists the first and third statements are admissible because they show the victim's motive and plan to possess a firearm and use it, and the second statement was admissible to show victim's angry state of mind. Appellant maintains the trial court abused its discretion in excluding these statements pursuant to the applicable exceptions to the rule against hearsay, and this Court must grant relief. We disagree.

Our standard of review of a trial court's admission or exclusion of evidence is well established and very narrow:

> Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record.

*Commonwealth v. Montalvo*, 604 Pa. 386, 403, 986 A.2d 84, 94 (2009), *cert. denied*, 562 U.S. 857, 131 S.Ct. 127, 178 L.Ed.2d 77 (2010) (internal citations and quotation marks omitted). "[A] discretionary ruling cannot be overturned simply because a reviewing court disagrees with the trial court's conclusion." *Commonwealth v. O'Brien*, 836 A.2d 966, 968 (Pa.Super. 2003), *appeal denied*, 577 Pa. 695, 845 A.2d 817 (2004) (internal citation and quotation marks omitted).

"Hearsay" is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Pa.R.E. 801(c). Generally, hearsay testimony is inadmissible at trial. Pa.R.E. 802. Pennsylvania Rule of Evidence 803 provides exceptions to the hearsay rule, in pertinent part, as follows:

> **Rule 803. Exceptions to the Rule Against Hearsay—Regardless of Whether the Declarant Is Available as a Witness**
>
> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
>            \*     \*     \*
>
> **(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional,

- 12 -

sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3).

Our Supreme Court has explained:

> "Pursuant to the state of mind hearsay exception, where a declarant's out-of-court statements demonstrate [his] state of mind, are made in a natural manner, and are material and relevant, they are admissible pursuant to the exception." [**Commonwealth v.**] **Laich**, [566 Pa. 19, 26,] 777 A.2d [1057,] 1060–61 [(2001)]. Axiomatically, and by its unambiguous terms, the exception renders admissible only those statements that reflect the "declarant's then-existing state of mind ... or condition," Pa.R.E. 803(3), not someone else's state of mind or condition. Nothing in the plain terms of the exception would allow, for instance, a party to introduce an out-of-court statement of one person to prove the intent, motive, feelings, pain, or health of another person. The bounds of the exception are limited to the then-existing state of mind of the declarant only.

**Commonwealth v. Fitzpatrick**, ___ Pa. ___, ___, 255 A.3d 452, 472 (2021)

(some quotation marks and case citations omitted).

Additionally:

> A statement proffered under the state of mind hearsay exception is not *per se* admissible merely because it is an expression of the speaker's then-existing mindset, with nothing more. The statement must also go to a "factor in issue"—*i.e.*, it must be relevant to some contested aspect of the case. **Laich**[**, supra** at 26], 777 A.2d at 1061 (citation omitted). "The victim's emotional state must relate to some legitimate issue in the case." 2 McCormick on Evidence § 276 (8th ed.). Finding relevance in a victim's mindset in a criminal case is fairly uncommon. **Indeed, a crime victim's state of mind typically is irrelevant and, thus, inadmissible. In murder cases in particular, it is the defendant's "state of mind, not that of the victim,**

- 13 -

> **which [is] material to establish the degree of guilt, if any, on the charge of criminal homicide."** ***Commonwealth v. Thornton***, 494 Pa. 260, 431 A.2d 248, 251 (1981)[.]

***Fitzpatrick, supra*** at \_\_\_, 255 A.3d at 474 (emphasis added). "[W]hatever purpose the statement is offered for, be it to show the declarant's intention, familiarity, or sanity, that purpose must be a 'factor in issue,' that is, relevant." ***Commonwealth v. Levanduski***, 907 A.2d 3, 15-16 (Pa.Super. 2006) (*en banc*), *appeal denied*, 591 Pa. 711, 919 A.2d 955 (2007), *cert. denied*, 552 U.S. 823, 128 S.Ct. 166, 169 L.Ed.2d 33 (2007). If the declarant's state of mind is "not a factor at issue in the case, the declarant's statement is immaterial and irrelevant to the prosecution's case." ***Id.***

Instantly, the trial court explained that it denied Appellant's request to admit statements that the victim allegedly made, because they were offered to prove the victim's state of mind and were inadmissible under our Supreme Court's ruling in ***Fitzpatrick***. (***See*** Trial Court Opinion at 24). To the extent Appellant sought to admit victim's statements as evidence of a third party's motive to kill the victim, the court excluded the proffered statements under ***Fitzpatrick*** because the state of mind exception does not extend to a third-party. (***See id.*** at 24-25).

We cannot say that the trial court abused its discretion in excluding the statements allegedly made by the victim. ***See Montalvo, supra***. Each of the three proffered statements of the victim's state of mind was irrelevant. Notably, Appellant did not argue self-defense or that the victim committed

suicide; thus, the victim's state of mind was not directly relevant to the elements of a specific defense. To the extent Appellant claims the statements were relevant because they showed the victim's intent and motive to shoot a third party, the victim's alleged motive to commit an unrelated crime is not relevant to the prosecution against Appellant for killing the victim. **_See_** **_Fitzpatrick, supra_**; **_Levanduski, supra_**. Accordingly, Appellant's first issue on appeal merits no relief.[2]

In his second issue, Appellant argues the trial court erred when it did not question the jury about whether their concern for their safety—based on their belief that Appellant's associates were recording them—factored into the guilty verdict. Appellant insists the court violated his constitutional right to a fair trial when the court did not question the jurors to determine whether they could remain fair or determine whether the jury was prejudiced by their fear that people associated with Appellant were recording them. Appellant concludes that he is entitled to a new trial on this ground. We disagree.

Preliminarily, we note that "[t]he Pennsylvania Rules of Appellate Procedure specify that issues that are not first raised in the trial court are

---

[2] To the extent Appellant claims that the third statement, in which the victim allegedly stated that he was going to shoot the person who had been communicating with his girlfriend and then turn himself in, was admissible under Pa.R.E. 804(b)(3) as a statement against interest, Appellant did not raise this claim before the trial court. As such, it is waived. **_See_** **_Commonwealth v. Cline_**, 177 A.3d 922, 927 (Pa.Super. 2017), _appeal denied_, 646 Pa. 735, 187 A.3d 210 (2018) (stating: "A new and different theory of relief may not be successfully advanced for the first time on appeal").

waived on appeal. Even issues of constitutional dimension cannot be raised for the first time on appeal." ***Commonwealth v. Strunk***, 953 A.2d 577, 579 (Pa.Super. 2008) (internal citations omitted).

> It is well established that trial judges must be given an opportunity to correct errors at the time they are made. ***See Commonwealth v. Clair***, 458 Pa. 418, 326 A.2d 272, 274 (1974). "[A] party may not remain silent and afterwards complain of matters which, if erroneous, the court would have corrected." ***Id.***, quoting ***Commonwealth v. Marlin***, 452 Pa. 380, 305 A.2d 14, 16 (1973) (citations omitted). Even where a defendant objects to specific conduct, the failure to request a remedy such as a mistrial or curative instruction is sufficient to constitute waiver. ***See, e.g., Commonwealth v. Jones***, 501 Pa. 162, 460 A.2d 739 (1983) (claim of prosecutorial misconduct waived where defense counsel immediately objected to the prosecutor's conduct but failed to request mistrial or curative instructions); ***Commonwealth v. Chimenti***, [524 A.2d 913, 921 (Pa.Super. 1987)] (issue was waived where defense counsel objected to a question posed by the prosecutor but failed to ask the trial judge to do anything further after the question had been answered).

***Strunk, supra*** at 579-80.

Further, "[i]n criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial." ***Commonwealth v. Jaynes***, 135 A.3d 606, 615 (Pa.Super. 2016) (citation omitted). We review a trial court's determination of whether prejudicial error occurred and whether a defendant is entitled to a mistrial for an abuse of discretion. ***Id.***

Here, the trial court accurately summarized the record as it pertains to this issue as follows:

At the start of the third day of trial, the jury informed [the trial court] that someone had been trying to film them, or was in fact, filming them as they left the courtroom outside the courtroom, and out to the parking lot. At that time, counsel agreed that the sheriff in charge would get a description and try to assure the jurors that the appropriate steps would be taken. A sheriff would be tuned in to see if anybody was trying to do anything in the courtroom, and, if so, the phone would be confiscated. In addition, at the lunch break and at the end of the day, the jury would be sent out, and no one else would be permitted to leave the courtroom until the appropriate time. Neither counsel raised anything further on this issue at that time.

During jury deliberations, this [c]ourt received a communication from the jury, "Due to prior recording by individuals related to [Appellant] which may include license plates, the jury is concerned with safety measures once the verdict has been read. Will any measures be taken to ensure the jury's safety after the trial?" On-the-record this [c]ourt stated that counsel, the [c]ourt, the sheriff and the sheriff's supervisor, conferred and agreed that the Sheriff Deputy Brian Lukens would be permitted to go into the jury room and read from a piece of paper with language we agreed on that says as follows, "As soon as the verdict has been given to the judge, deputies will make sure you are all escorted to your vehicles and off the property prior to releasing anyone from the courtroom. We will not allow anyone to follow you to your cars. Is everyone parked in the same lot? If not, where?" It was learned that one juror was getting picked up and not in the lot. It further stated, "If you have further concerns, please put it in writing signed by the foreperson." Immediately after that communication with the jury, this [c]ourt was made aware that the jury had reached a verdict. Neither the Commonwealth, nor defense counsel had anything to add to what was placed on the record.

At the conclusion of the trial and after the jury was dismissed, defense counsel put an issue on-the-record that was spoken about when the jury communication was received, namely that he believed that the jury should have been asked whether or not the conduct was going to have or was having any influence on their verdict; or when they

- 17 -

rendered their verdict, did that conduct have any influence on their verdict. The Commonwealth responded that there was no evidence that the jury did anything other than deliberate in good faith or that the deliberations were compromised in any way by an outside influence. This [c]ourt agreed with the Commonwealth that there was no evidence that the deliberations were compromised. Additionally, the way things developed the jury reached its verdict and then they had this concern and they wanted their concern addressed before the verdict was announced. Finally, this [c]ourt stated that it would not have questioned the jury in this manner even if they had not been dismissed.

Initially, when the issue of [video recording] was brought to this [c]ourt's attention at the start of the third day of trial, a proposal of how to handle the situation was set forth and agreed to by the Commonwealth and defense counsel. The plan was to make sure the jurors['] safety concerns were addressed and to prohibit anyone from further engaging in the reported behavior. There is no evidence or allegation that this plan was not effective. There were no further reports that jurors were being videotaped by those observers in the courtroom associated with [Appellant].

(Trial Court Opinion at 30-32).

Upon review, we conclude that Appellant waived any claim with respect to the procedure put in place to address the jury's concern about being recorded. Appellant did not raise any objection to the procedure initially discussed on the third day of trial, nor did he object to the procedure put in place by the court at the close of jury deliberations, and he did not move for a mistrial. Instead, Appellant made only a belated request to question the jurors, after the court had already discharged them. Therefore, Appellant waived his second issue on appeal by failing to object at the appropriate stage of the proceedings. *See Strunk, supra*.

- 18 -

In his third issue, Appellant argues the verdict rendered by the jury was against the weight of the evidence. Specifically, Appellant claims that there was no concrete evidence or motive established to support the verdict. Appellant reasserts his version of the facts in this argument section and maintains that "[t]his version of the facts should shock one's sense of justice[.]" (Appellant's Brief at 54). Appellant concludes the trial court should have granted his post-sentence motion for a new trial, and this Court must grant relief. We disagree.

When examining a challenge to the weight of the evidence, our standard of review is as follows:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the…verdict if it is so contrary to the evidence as to shock one's sense of justice.
>
> Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

**Commonwealth v. Champney**, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (internal citations omitted). A "trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings."

**Commonwealth v. Rivera**, 603 Pa. 340, 363, 983 A.2d 1211, 1225 (2009),

*cert. denied*, 560 U.S. 909, 130 S.Ct. 3282, 176 L.Ed.2d 1191 (2010). "[I]f there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we must affirm." ***Commonwealth v. McFarland***, 278 A.3d 369, 385 (Pa.Super. 2022), *appeal denied*, ___ Pa. ___, ___, 291 A.3d 863 (2023) (quoting ***Corvin v. Tihansky***, 184 A.3d 986, 992-93 (Pa.Super. 2018)).

Instantly, the record supports the trial court's denial of Appellant's post-sentence motion seeking a new trial based on Appellant's challenge to the weight of the evidence. ***See McFarland, supra***. Based on the evidence adduced at trial, as set forth above, we cannot say that the trial court palpably abused its discretion in ruling on the weight claim. ***See Champney, supra***. Thus, Appellant's third issue merits no relief. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/8/2023